**Bruce G. SUNDLUN, Plaintiff,**

and

**Detroit Bank & Trust Company, Intervening Plaintiff,**

**v.**

**EXECUTIVE JET AVIATION, INC., a corporation of the State of Delaware, Lassiter Aircraft Corporation, a corporation of the State of Delaware, Olbert F. Lassiter, Woodrow P. Swancutt, and Perry M. Hoisington, III, Defendants,**

and

**Eloise Minor, Intervening Defendant.**

Court of Chancery of Delaware, New Castle County.

Dec. 28, 1970.

Edmund N. Carpenter, II, and Richard J. Abrams, of Richards, Layton & Finger, Wilmington, for plaintiff, Bruce G. Sundlun.

Hugh L. Corroon, of Potter, Anderson & Corroon, Wilmington, for intervening plaintiff, Detroit Bank & Trust Co.

Henry N. Herndon, of Morris, James, Hitchens & Williams, Wilmington, for defendant, Executive Jet Aviation, Inc.

Irving Morris and Joseph A. Rosenthal, of Cohen, Morris & Rosenthal, Wilmington, Harold B. Dondis, Edwin J. Carr, William F. Griffen, Jr., of Rich, May & Bilodeau, Boston, Mass., for defendant Olbert F. Lassiter.

S. Samuel Arsht and William O. LaMotte, 3d, of Morris, Nichols, Arsht & Tunnell, Wilmington, for defendant Perry M. Hoisington, III.

Joseph A. Rosenthal, of Cohen, Morris & Rosenthal, Wilmington, for intervening defendant, Eloise Minor, and appearing specially for defendant Woodrow P. Swancott.

DUFFY, Chancellor:

A contest for control of Executive Jet Aviation, Inc. (EJA), a Delaware corporation, is at issue in this case, and each side has moved for summary judgment as to Count Four of the complaint, which seeks a determination of the validity of the election of directors.

A.

EJA was founded in 1964 by General O. F. Lassiter, one of the defendants. American Contract Company (ACC), a wholly-owned subsidary of the Penn Central Transportation Company (then the Pennsylvania Railroad Company), acquired in 1965 a 58% equity interest in EJA. Penn Central caused EJA to amend its charter to provide for two classes of stock: Class A voting stock and Class B which was non-voting but readily convertible to Class A on a share-for-share basis. ACC acquired 659,405 shares of the Class B and was given preemptive rights to preserve its equity ratio (58:42).[1]

In 1966 EJA sought Civil Aeronautics Board (CAB) approval to purchase a supplemental air carrier (Johnson Flying Service, Inc.). At the CAB hearing it appeared that EJA (and Penn Central) were in violation of § 408 of the Federal Aviation Act of 1958, 49 U.S.C.A. § 1378, which forbids interlocking relationships between air and surface carriers. EJA and Penn Central were given six months to eliminate the latter's domination and control of EJA.

One of the elements of control examined by the CAB was the transferability of Class B shares into voting Class A. In effect, this assured ACC control of EJA. Penn Central caused EJA to amend its charter on November 13, 1967 to meet CAB objections: the amendment made Class B shares non-convertible in the hands of Penn Central and companies it controlled.

This amendment and other action taken by the parties was not adequate, however, to satisfy the CAB. Specifically, it found that these "[fell] short of accomplishing divestiture" that had been ordered. The CAB suggested that ACC's B stock be placed in a liquidating voting trust which

1. Glore Forgan, Wm. R. Staats, Inc., a New York investment banking firm, was also an initial holder of B stock and it was involved in many of the matters discussed herein. But an independent consideration of its activities is not necessary to a decision on the motions.

would commit the Penn Central to complete divestiture. Accordingly, a voting trust was created in August 1968 with the Detroit Bank & Trust Company as Trustee. ACC's 659,405 shares of B stock were surrendered to EJA which issued a certificate for 659,405 shares of A stock to the Detroit Bank in August 1968. That certificate, in effect, represents control of EJA.

In later proceedings the CAB expressly required that the first voting trust be amended to provide that the Trustee must liquidate the stock by sale to a non-affiliated person by a specified date and that, during the interim, the Trustee would have the right to vote the shares in its independent discretion. Accordingly, ACC and the Trustee executed, under date of November 10, 1969, a "Voting and Liquidation Trust Agreement No. 2," parts of which are discussed hereinafter.

Bruce G. Sundlun (plaintiff) was a director, executive committee member, secretary, and general counsel for EJA. Differences developed within the Board and he was removed as secretary in January 1969, and from the executive committee in June 1969. On July 1, 1970, the Detroit Bank signed a "Consent of Majority Stockholders in Lieu of Annual or Special Meeting Pursuant to 8 Del.C. § 228" which allegedly ousted the then directors of EJA and replaced them with a new board headed by plaintiff. Physical possession of EJA's facilities was taken then by plaintiff's group which also elected new officers.

A shareholders meeting was called by plaintiff for July 22, 1970. The meeting

was convened and, over the protests of General Lassiter, the shares held by the Trustee were voted to elect plaintiff's slate of directors.

The complaint, derivatively for EJA, was filed here on June 30, 1970 asking for an accounting by General Lassiter for alleged misuse of corporate funds. Count Four was added on August 14.

### B.

In Count Four plaintiff applies to the Court under 8 Del.C. § 225 for a determination of the validity of the election of directors on July 1, 1970, by written consent pursuant to 8 Del.C. § 228, and on July 22, 1970, at a meeting of stockholders.[2]

The issues argued in the briefs are many and complex. But, in the view I take, there is something relatively simple at the core of the case in its present posture, and once that is found and decided, most of the other contentions are mooted.

The basic issue, as defendants argue, is whether the Trustee is entitled to vote the Class A stock which it holds, or whether it has (or should have) only B stock which is without voting right. And that issue depends upon whether the conversion from B to A stock made in August 1968 was valid under the EJA charter.

The key provision in the charter, which was added by the amendment effective November 13, 1967, reads as follows:

"(h) Any Class A shares may at the option of the holder be converted into Class B shares, share for share, and any

2. 8 Del.C. § 225 provides:
"Upon application of any stockholder, * * * the Court of Chancery may hear and determine the validity of any election of any director, * * * or officer of any corporation, and the right of any person to hold such office, * * *"
8 Del.C. § 228 provides:
" * * * any action which may be taken at any annual or special meeting

of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted. * * *"

Class B shares may at the option of the holder be converted into Class A shares, share for share, except that Class B shares owned of record by, or known to the corporation to be owned beneficially by, an 'initial holder' (as hereinafter defined) may be converted into Class A shares only after the beneficial ownership of the Class B shares as to which conversion is requested has been transferred to a person not an 'initial holder.' As used herein, the term 'initial holder' means any shareholder to whom the corporation issued any Class B shares prior to November 30, 1967 and any person directly or indirectly controlling, controlled by or under common control with such shareholder."

It is undisputed that ACC was an "initial holder" within the meaning of the charter language. B shares in its hands, therefore, could be converted into Class A shares "only after the beneficial ownership" of those shares had "been transferred to a person not an 'initial holder.'" Defendants argue that the conversion was accomplished without a change in beneficial ownership and it was therefore void. They say that the stock could not, cannot be converted by the Trustee because beneficial ownership remains in the initial holder, ACC.

 The rules which govern the interpretation of statutes and contracts apply to the interpretation of corporate charters. Lawson v. Household Finance Corporation, 17 Del.Ch. 343, 152 A. 723 (1930), and when language is clear and unambiguous, it does not require construction by a court. But if the meaning of the words used is not plain and unambiguous, under the circumstances of the case, then the Court will look to the surrounding circumstances. See Gluckman v. Holzman, 29 Del.Ch. 458, 51 A.2d 487 (1947), and the quotation therein from Judge Learned Hand's opinion.

The critical phrase in the charter is "beneficial ownership." What does it mean? Defendants seem to say that in common parlance it implies a trust type of relationship, that it means an equitable as distinguished from mere legal ownership, that it includes a right to income from property, to the proceeds from its sale, and so on. Broadly speaking, it does convey all of this. But nothing has been called to my attention which ascribes to "beneficial ownership" a universal meaning; it is, rather, a phrase of art which implies certain relationships and attributes but which requires particularization before its meaning can be precisely determined. In short, it is my view that the phrase requires construction by the Court. And both sides agree that the context in which the amendment was made has significance. Indeed, defendants argue that this confirms the literal meaning of the charter language itself. The circumstances are significant and I look to them for aid in construing the phrase as it appears in the EJA charter.

As to these, it is undisputed that at all times before friction emerged within the Board, all parties were working in common cause to satisfy the CAB and that meant effectively getting ACC out of EJA. Many steps were taken to accomplish this, and the record overwhelmingly demonstrates the details. The charter amendment in which the language at issue appears was one of a series of steps taken for that purpose. And it came before either trust was created. The first voting trust was another move in the common effort to meet CAB requirements. And then came the second voting trust.

It is in this context that the corporate charter must be examined. And coupled with it must be the second voting and liquidating trust. In my judgment, that document determines what was transferred by ACC to the Trustee and what was not. That document is not clear and contains some contradictory language. See, for example, Exhibit A thereto, which states a form of voting trust certificate providing for return of EJA shares to ACC. But

that language is not determinative in view of the specifics laid out in the following paragraphs:

## "4. TERMINATION

This Trust shall terminate when the divestiture of the Stock * * * provided for in Article 6 hereof has been completed and the assets received in exchange therefor have been conveyed to American, and until then shall be irrevocable and may not be terminated or modified in any manner whatsoever without the approval of the Civil Aeronautics Board, * * *.

## 5. VOTING RIGHTS

All voting rights in the Stock * * * subject to the Trust shall be exercised by the Trustee in its independent discretion, free from any participation, suggestion or control of the PRR [Penn Central] or American.

## 6. DIVESTITURE

American grants to the Trustee, and the Trustee accepts, all power necessary to permit the Trustee to divest American's beneficial interest in the Stock * * * by sale, exchange or other transfer for value, and to transfer clear title to and the beneficial interest in such Stock * * *, free of any interest of American, to the transferee or transferees thereof. The Trustee shall transfer all the Stock * * * on or before March 1, 1971, at a price and upon terms determined in the Trustee's sole and independent discretion and taking due regard of the necessity of effectuating complete divestiture by such date. American and PRR shall cooperate fully with the efforts of the Trustee to transfer the Stock * * * as expeditiously as possible. The Trustee shall accomplish divestiture in such a way that, following divestiture, no person who is an employee or director of PRR of its subsidiaries, or a substantial investor, creditor or debtor thereof, or who is sub-

ject to the influence or control of PRR, shall have any interest, direct or indirect, in EJA. Any contract providing for the transfer of any of the Stock * * * shall be conditioned on Civil Aeronautics Board approval * * *."

It thus appears that by and pursuant to this instrument ACC irrevocably transferred *all* B stock it held to the Trustee, which had a duty to exercise *all* voting rights in its independent discretion, and to dispose of *all* stock before March 1, 1971 on terms determined by the Trustee's independent discretion—and with a mandate to keep the stock away from Penn Central and EJA. All of this is accomplished under CAB supervision both in its preparation and implementation. And one objective is understood in all of the documentation relating to this: ACC was to part permanently with the B shares of EJA which it held. And it did so by delivery of them to the Trustee pursuant to the agreement.

In plain words, everybody wanted those shares completely out of ACC. And I conclude that the liquidating trust agreement accomplished that. Realistically, after its execution ACC's rights were limited to those specified in the trust agreement, most particularly the right to have transferred or conveyed to it assets which the Trustee receives for the shares.

What construction, then, should the Court give to "beneficial ownership" as it appears in Section (h) of this charter?

■ Of course, ACC is the "beneficial owner of the Class B shares" in one sense; it is certainly entitled to proceeds from sale, for example. And it has other rights as well. But, on the other hand, it is certainly not a beneficial owner of those shares as to voting them or to getting them back under any circumstance. It seems to me that in this choice of meanings the Delaware cases provide a useful guide. In Investment Associates v. Standard Power and Light Corp., 29 Del.Ch. 225, 48 A.2d

501 (1946), aff'd 29 Del.Ch. 593, 51 A.2d 572 (1947), this Court said that:

> "* * * where there is a choice between a construction [of a charter] comporting with 'fairness and reasonableness' as compared with a construction which will lead to unreasonable results, the former construction will be adopted."

This rule of rational and probable agreement of interpretation had its Delaware origin in Holland v. National Automotive Fibres, 22 Del.Ch. 99, 194 A. 124 (1937).

After execution of the second voting and liquidation agreement ACC's right in the Class B shares was limited to those specified in that document. And that limited ACC to a right to the proceeds from the sale of those shares or, in the language of the agreement itself, the right to have transferred or conveyed to it assets which the Trustee receives for the shares. In this respect ACC's situation is comparable to that found in Nickson v. Filtrol Corporation, Del.Ch., 265 A.2d 425 (1970) and in Cheff v. Athlone Industries, Inc., Del. Supr., 233 A.2d 170.

Considering the context in which Section (h) was adopted, the purpose sought to be achieved thereby, and the interest which ACC has in the stock following execution of the divestiture agreement, I conclude that it is not a beneficial owner of the Class B shares within the meaning of that Section. In my view that result is fair and reasonable and consistent with what the parties themselves did. And it produces a rational result in terms of its impact upon the stock as a whole.

As to the stock, unless the Trustee votes the 659,405 shares which it holds, then no one will. That would mean that a majority of the outstanding stock would be dead for voting purposes; and that in turn would mean that a 42% equity in EJA would be, for control purposes, 100%. Certainly none of the parties at any time contemplated or planned for that result. But all parties did regard the conversion of the B shares to A shares as valid under the charter from the time when that was done, August 1968, until friction developed within the Board in 1970. Specifically, General Lassiter himself signed the certificate for the A shares issued to the Trustee and he accepted and agreed to the trust agreement on behalf of EJA. The shares held by the Trustee were voted in a special meeting of stockholders on November 4, 1968 and again at the annual meeting held on April 17, 1969. At neither meeting was an objection of any kind made by any stockholder. In short, after execution of the trust agreement, all parties, including stockholders, assumed and acted on the assumption that the trust agreement accomplished the divestiture by ACC which the CAB had formally ordered. To paraphrase Lord Chancellor Sugden's famous dictum, what the parties did under Section (h) is eloquent testimony of what it means.

I conclude that after execution of Voting and Liquidating Trust Agreement No. 2 and delivery of the B shares to the Trustee, ACC did not have any beneficial ownership of those shares within the meaning of EJA's charter and the conversion which was made following the transfer was by a person not an initial holder. It follows that the issuance of A shares to the Trustee was not in violation of EJA's charter. Accordingly, defendants' motion for summary judgment as to Count Four of the complaint will be denied and plaintiff's motion for summary judgment as to that Count will be granted.