**SPRING GARDENS HOMES ASSOCIATION, INC., Plaintiff**

v.

**MR. AND MRS. EDWARD FRANCIS, et al., Defendants**

Civil No. 1041/1977

Territorial Court of the Virgin Islands

Div. of St. Croix at Christiansted

July 28, 1978

VINCENT A. GAMAL, ESQ., Christiansted, St. Croix, *for plaintiff*

R. ERIC MOORE, ESQ. (O'BRIEN & MOORE), Christiansted, St. Croix, *for defendants*

SILVERLIGHT, *Judge*

## MEMORANDUM OPINION AND JUDGMENT

This action was brought by plaintiff homeowners' association against one of its members who fenced in a small plot of the "common area" owned by the Association for the common use of all members. Defendant counterclaimed for specific performance of an alleged oral promise by the Association to convey the plot in issue to defendant, or in the alternative, for damages as reimbursement for the costs of construction and, if necessary, removal of the fence built in reliance on that promise.

Plaintiff Spring Gardens Homes Association, a non-profit corporation duly chartered pursuant to Title 13, Chapter 3, Virgin Islands Code, was incorporated by the developers of Estate Welcome, Inc., for the stated purpose, inter alia, of providing for the maintenance, preservation, and architectural control of the residences in the Tulipan Section, and to promote the health, safety, and welfare of its residents. The Association's membership is comprised of all persons owning or having the right of ownership in at least one plot of that portion of Eliza's Retreat designated as Lots 1 through 53 on PWD Drawing No. 1727—19, 20, 21 and 22, known as the "Tulipan Section."

The Tulipan Section is a modern housing development subdivided in such manner as to provide a large "common area" of parkland in the center, from which individual plots radiate. The plots that encircle the common area are owned by members of the Association, but the central common area was deeded in fee simple by the developers

245

of Estate Welcome, Inc., to the plaintiff Association by warranty deed for use as a park by its members. The Association's "Declaration of Covenants, Conditions and Restrictions" referred to in that deed provides, in pertinent part, only that "every member shall have a right and easement of enjoyment in and to the common area."

The defendant is the owner of Plot 39, one of the plots that radiate from the common area. The present controversy grows out of his desire to purchase and fence a small portion of the common land adjoining his property, and later determination by the Board of Directors of the Association that the Board lacked the authority to sell him that plot of common land.

The facts, succinctly stated, are undisputed, being verified by the minutes of the Association as it met and its Board discussed the sale of the plot in issue to defendant. On April 14, 1975, at the regular monthly meeting of the Association, defendant requested permission of the Board to purchase a 1,350 square foot portion of the common area adjoining the rear of his property for the purpose of building a fence/retaining wall to protect his yard from stray horses which ruined his plantings, and to protect his property from flooding and mud emanating from the remainder of the common area.

At this time, defendant was a member of the Board, but took no part in the voting process relative to his request. The Board was uncertain about the boundary lines of common area and withheld action until they could contact a surveyor to establish these lines definitely. Apparently, nothing was done to have the property surveyed until three months later, when the president of the Board of Directors signed a consent form necessary to have the survey made and presented to Public Works for approval. The vice president was, at that time, directed to make inquiries

about the market value of said portion "to expedite the transaction."

On December 5, 1975, defendant duly submitted the plan, approved by Public Works, separating Plot 71 (the parcel defendant wished to purchase), from the remainder of Plot 45 (the common area), and attaching Plot 71 to defendant's Plot 39 "in perpetuity."

The minutes of the monthly meetings continued to express an intention on the part of the Board of Directors of the Association to sell defendant the small portion of the common area in issue, the only delay arising from the Board's hesitation to set a price until more accurate measurements were obtained so that the cost could be determined on the basis of the actual square footage involved. Despite the fact that the price had not been definitely set, defendant was so confident that the sale had been agreed upon as a result of the Board's actions, that he assumed possession of Plot 71, which he had been permitted to separate from the common area, prior to the May 5, 1976, Board meeting, and constructed a fence enclosing it for the purpose, as stated, of protecting his property from strays and "wash aways." This construction was performed openly and with the knowledge of the Board and all nearby property owners, none of whom either questioned the construction or objected to it.

On December 3, 1976, the square footage of the parcel in issue was determined to be 1,350 square feet, and the Board directed three members, including defendant, to return with firm market value figures per square foot for the purchase of the land. This was accomplished at a meeting of the Board of Directors on December 30, 1976, at which time the Board established the fair market price of the land to be $.50 per square foot, reflecting the low caliber of the land. The Board ordered a "bill" to be sub-

mitted to defendant for $675.00 for the common area he wished to purchase.

At this point, the Board treated the matter as settled, the "President's Report" for the year February, 1976, through January, 1977, stating that the Board had determined the price and submitted a "bill" for the sale of the plot of common land to defendant in December, 1976.

A new Board thereafter entered office prior to February 6, 1977. At a meeting of the Board of Directors on that date, the new directors, fearing a "raid" on the common lands by other parties having less justification than defendant's need for drainage and protection, began to have misgivings about the sale of common lands to any member. While the Board acknowledged the fact that it had approved the sale to defendant and had approved the survey permit submitted to Public Works, it directed that a letter be sent to defendant informing him that its legal counsel had advised it that the Board had no authority to sell common area lands unless approved by at least two-thirds of the membership and instructing him to remove all structures he had placed upon the common area.

Defendant immediately tendered a check to the Association for $675.00, the billed and agreed purchase price of the 1,350 square feet. This check was rejected by the president of the Association on March 21, 1977, the day a special meeting was held by the Board at which it was decided to hold a general meeting of all members to vote on the issue of selling common area property to individual members. In May, 1977, a general membership meeting was finally held at which a quorum was present, and over two-thirds of those eligible voted not to sell common area property.

This action against defendant followed the May, 1977, general membership vote, defendant having, in the interim, refused to tear down his fence or to relinquish possession

of the 1,350 square feet of common land. Defendant, alleging that the Association reneged on its promise to sell, is demanding specific performance. Plaintiff claims that its Board acted beyond its authority in agreeing to sell defendant common area lands without first obtaining approval of such sale by two-thirds of the general membership, and that any promise to sell is therefore void and unenforceable.

It is undisputed that the Board of Directors did, at its December 30, 1976, meeting, duly vote to sell the small plot in issue to defendant for $.50 per square foot, and that a "bill" for the purchase of the land for $675.00 was submitted to defendant, who, within a reasonable time thereafter, tendered that amount to the Association. The regular minutes of the Association and the President's Report for 1976, all duly verified and signed by the party against whom they are charged, amply serve as "writings," that take the proposed sale out of the Statute of Frauds and place the matter before the Court solely on the question of the authority of the Board to sell common area lands.

The determination of this case can be found in an examination of the Articles of Incorporation, By-Laws and Declaration of Covenants, Conditions and Restrictions of the Spring Gardens Homes Association. Within these corporate documents lie the authority, or lack thereof, of the Board of Directors to sell defendant a portion of the common area without the consent of two-thirds of the general membership obtained in a general election.

The same rules which govern the construction of statutes, contracts and other written instruments apply to the interpretation of charters, articles and other corporate instruments. Sundlun v. Executive Jet Aviation, Inc., 273 A.2d 282 (Del.Ch., 1970) ; Dempster Mfg. Co. v. Downs, 101 N.W. 735 (Iowa, 1904). When language is

clear and unambiguous, the Court cannot construe it in other than the plain and literal meaning of the language used. Independent Oil Wkrs. of Paulsboro, N.J. v. Mobil Oil Corp., 441 F.2d 651 (3rd Cir. 1971); Resort Car Rental System, Inc. v. Chuck Ruwart Chev., Inc., 519 F.2d 317 (10th Cir. 1975). We see no ambiguity or lack of clarity in the language of the Articles of Incorporation, By-Laws, and Declarations of Covenants, Conditions and Restrictions of the Association, and will, therefore, refuse to rewrite those instruments thereby broadening their stated scope.

■ The Articles of Incorporation of Spring Gardens Homes Association, Inc., state that the affairs of the Association shall be managed by a Board of Directors, each of whom is elected by the membership of the Association. These Articles grant certain specific powers to the Association, among which is the power "to acquire (by gift, purchase or otherwise), own, hold, improve, build upon, operate, maintain, *convey, sell, lease, transfer, dedicate for public use or otherwise dispose of real or personal property* in connection with the affairs of the Association" and "to have and to exercise any and all powers, rights and privileges which a corporation organized under the Non-Profit Corporation Law of the Virgin Islands by law may now or hereafter have or exercise." (Emphasis added.)[1]

Among those powers granted by the Virgin Islands under the Non-Profit Corporation Law is the power to "purchase, hold and convey real and personal property, as the purposes of the corporation may require," and to "enter into any lawful contracts and incur obligations essential to the transaction of its affairs for the purpose for which it was formed." 13 V.I.C. § 493, Non-Profit Corporations.

---

[1] Articles of Incorporation, Article IV, "Purpose and Powers of the Association," subparagraphs (d) and (f).

From the above, it is clear that the Association does have the power to sell and convey real property held by the Association. The primary question remaining, then, is whether the common area is subjected to the special requirement of assent of two-thirds of the general membership as a condition precedent to conveyance by the Board to a private person.

There is no proscription in the corporate documents against the sale of the common area lands to a private purchaser. While an unsophisticated purchaser of a plot in the Tulipan Section might be under the impression that the "park" area in the center was protected and inviolate from sale to members or to the public, such is clearly not the case, as is seen by a careful reading of the corporate documents.

The members' "easement of enjoyment" lies only in whatever common area the Association owns at any moment. The Association defines what the common area is by whatever portion it chooses to make available "for the common use and enjoyment of the members of the Association."

While it is established that the Association has the power to sell or convey its real property, there are certain specific provisions in the Articles of Incorporation identifying the occasions upon which the assent of the general membership is required in dealings with the Association's real property. Article VIII, "Authority to Mortgage" provides that "[a]ny mortgage by the Association of the Common Area defined in the Declaration [of Covenants, Conditions and Restrictions] shall have the assent of two-thirds (⅔) of the membership." Article IX, "Authority to Dedicate" provides that no dedication, sale or transfer of all or part of the common area to any public agency, authority or utility "shall be effective unless agreed to by two-thirds (⅔) of the membership." Ar-

251

ticle III, "Property Rights" Section 1(e) of the Declaration of Covenants, Conditions and Restrictions, recites, "No such dedication or transfer shall be effective unless an instrument signed by members entitled to cast two-thirds (⅔) of the votes has been recorded, agreeing to such dedication or transfer, . . ." These are the only three instances when the assent of the general membership is specifically required for the Association to sell, transfer or mortgage property.

The By-Laws of the Association explicitly provide that:

The Board of Directors shall have power:

(b) To exercise for the Association all powers, duties and authority vested in or delegated to this Association not reserved to the membership by other provisions of these By-Laws, the Articles of Incorporation, or the Declaration.[2]

■ What is reserved for the assent of the membership is only the approval of the mortgaging of the common area, or its transfer, sale, or dedication *to any public agency, authority or utility.* (Emphasis added.) All other sales are delegated to and vested in the Board of Directors, as succinctly stated in Article IV of the Articles of Incorporation, supra. Accordingly, the Court finds as a matter of law that no vote of the general membership was required by either the Articles of Incorporation, By-Laws, or deed restrictions for the Board of Directors to sell the plot in litigation to the defendant, provided such sale was in furtherance of such purposes. This case need not go to its conclusion on the premise that the Board did not step beyond some negative limit, and that thus the sale was valid. The Court sees a clear and positive mandate in the corporate records that the Board act to promote the best interests of its members, and we conclude that it did exactly that in consenting to the sale of the plot to defendant.

---

[2] By-Laws, Article VIII, "Powers and Duties of the Board of Directors," Section 1(b), page 4.

As stated earlier, the Articles of Incorporation declare that one of the specific purposes for which the Association was formed was to promote the health, safety and welfare of the residents of the development. In the case sub judice, the Association was presented with a situation where a member's plot was being invaded by stray horses and flood waters and mud from the common area. The Board responded in a manner which promoted the health, safety and welfare both of the defendant and of the other members of the Association.

The flood waters, loose mud and stray horses created a condition on defendant's plot that decreased its value and utility, as well as constituting a health and safety hazard from the stench, debris and infestation attendant upon flood waters washing through unprotected lands. In allowing defendant the opportunity to buy the land and build a fence to protect his property, it is unquestionable that the Board clearly promoted defendant's welfare. At the same time, however, it acted just as clearly to promote the welfare of all of the residents and members of the Association. If defendant's plot were allowed to lose a significant portion of its value due to the problems of floods and strays, the property values of the surrounding neighborhood would also decrease. In acting to maintain the defendant's residence free from damage or decrease in value, the Board was consequently acting in the best interests of the entire development and promoting the general welfare of all members, for were one plot to fall into decline, a general blight would likely spread from house to house throughout the neighborhood, as an infection spreads its poison through a healthy body from a festering sore. Therefore, the Court finds as a fact that the sale itself was a good faith act by the Board in promotion of the general welfare of the Association.

As a natural adjunct to this authority is the stated

power of the president to "see that all orders and resolutions of the Board are carried out; shall sign all leases, mortgages, deeds and other written instruments. . . ."[3] Following the consensus of the Board that the property should be sold to defendant, the president, on December 30, 1976, duly carried out the resolution of the Board and directed that a "bill" should be sent to defendant, so that, on receipt of $675.00, the president could then convey the plot.

In light of the above findings of fact and law, the Court is faced with but one alternative, and it hereby concludes that there was no legal basis for the subsequent Board to declare improper and ultra vires the action of the prior Board in agreeing to sell and thereafter proffering a "bill" for the plot which defendant had fenced. The Board acted with due circumspection over a period of 20 months in determining the exact area and boundary measurements of the plot, in requiring the surveying of the plot, in having Public Works approve the survey, in collecting three estimates of fair market value, and, finally, in agreeing to sell the plot to defendant at the agreed fair market price. There were no irregularities alleged, and throughout the dealings the defendant took no part in any vote on his request, notwithstanding his membership on the Board at that time.

■ After due consideration of all the facts, and after an examination of all the pertinent documents, the Court concludes that the agreement to sell the plot to defendant was within the power and actual authority of the Board to make, and that defendant has the right specifically to enforce that promise and to demand conveyance of the plot which he has already fenced at considerable expense to himself in reliance on the Board's promise to convey.

---

[3] By-Laws, Article XI, "Officers and Their Duties," Section 8(a), page 7.

Plaintiff's requests for an injunction and punitive damages are accordingly denied, as is that portion of defendant's counterclaim seeking reimbursement of the costs of construction and removal of the fence. Plaintiff is to convey forthwith to defendant by warranty deed, upon payment by defendant of the sum of $675.00, Plot 71 of Eliza's Retreat, as recorded on the revision map, Survey Drawing No. 1727-24, dated November 21, 1975, and recorded with the Department of Public Works.

Costs and attorney's fees established in conformity with the Estien v. Christian guidelines shall be awarded defendant upon submission of a bill of costs and attorney's affidavit of services rendered.

### JUDGMENT

In accordance with the Memorandum Opinion of even date herewith, it is

ORDERED, ADJUDGED AND DECREED that plaintiff's complaint be and the same hereby is dismissed; and it is further

ORDERED, ADJUDGED AND DECREED that that portion of defendant's counterclaim seeking reimbursement for costs of construction and removal of the fence be and the same hereby is dismissed; and it is further

ORDERED, ADJUDGED AND DECREED that plaintiff shall convey forthwith to defendant by warranty deed, upon payment by defendant of the sum of $675.00, Plot 71 of Eliza's Retreat, as recorded on the revision map, Survey Drawing No. 1727-24, dated November 21, 1975, and recorded with the Department of Public Works; and it is further

ORDERED, ADJUDGED AND DECREED that costs and attorney's fees shall be awarded to defendant upon submission of a bill of costs and attorney's affidavit in conformity with the Estien v. Christian guidelines.