ANADARKO PETROLEUM CORPORA-
TION, a Delaware corporation, and
Pan Eastern Exploration Company, a
Delaware corporation, Plaintiffs Below,
Appellants,

v.

PANHANDLE EASTERN CORPORA-
TION, a Delaware corporation, Pan-
handle Eastern Pipe Line Company, a
Delaware corporation, Trunkline Gas
Company, a Delaware corporation,
Anadarko Production Company, a De-
laware corporation, R.L. O'Shields,
R.D. Hunsucker, and R.C. Dixon, De-
fendants Below, Appellees.

Supreme Court of Delaware.

Submitted: Jan. 19, 1988.
Decided: June 23, 1988.
Reargument Denied Aug. 12, 1988.

---

 ██

William Prickett (argued), Vernon R. Proctor, Wayne J. Carey of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, Keith A. Jones (argued) of Fulbright & Jaworski, Washington, D.C., Charles H. Still of Fulbright & Jaworski, Houston, Tex., and Dan A. Spencer of Anadarko Petroleum Corp., Houston, Tex., for appellants.

Lawrence A. Hamermesh (argued) and Leone L. Ciporin of Morris, Nichols, Arsht & Tunnell, Wilmington, Frank Douglass and Charles G. King of Scott, Douglass & Luton, Houston, Tex., and David B. Tulchin, Hyman L. Schaffer and Norman Feit of Sullivan & Cromwell, New York City, for appellees.

Before CHRISTIE, C.J., MOORE and WALSH, JJ.

WALSH, Justice:

This is an appeal from a decision of the Court of Chancery granting summary judgment against Anadarko Petroleum Corporation ("Anadarko") in its suit against three of its former directors and its former parent, Panhandle Eastern Corporation ("Panhandle"), for an alleged breach of fiduciary duty in modifying certain contracts, the so-called disputed agreements, between Anadarko and Panhandle. The lawsuit arises from a spin-off of Panhandle's wholly-owned subsidiary, Anadarko, through a stock dividend. After the stock dividend was declared but prior to the date of distribution, Panhandle and the Anadarko board of directors approved the disputed agreements. Anadarko argues that the disputed agreements are voidable because they are unfair and were approved in violation of fiduciary duties owed to the prospective stockholders of Anadarko. The Court of Chancery ruled as a matter of law that the former directors of Anadarko owed a fiduciary duty only to the parent corporation, Panhandle, at the time the disputed agreements were approved. Further, because Anadarko's claims with respect to the validity of the disputed agreements were premised on the existence of a fiduciary duty owed to the prospective stockholders of Anadarko, the court granted summary judgment against Anadarko.

This appeal presents a novel issue: whether a corporate parent and directors of a wholly-owned subsidiary owe fiduciary duties to the prospective stockholders of the subsidiary after the parent declares its intention to spin-off the subsidiary. We conclude that prior to the date of distribution the interests held by Anadarko's prospective stockholders were insufficient to impose fiduciary obligations on the parent and the subsidiary's directors. Accordingly, we affirm the decision of the Court of Chancery.

I

Panhandle, through its subsidiaries, Panhandle Eastern Pipeline Company ("Pipeline") and Trunkline Gas Company ("Trunkline"), is engaged in the pipeline transportation of natural gas. Prior to September, 1986, another Panhandle subsidiary Anadarko Production Company ("Production") through its subsidiary Anadarko was engaged in the exploration and production of crude oil and natural gas.

On August 20, 1986, Panhandle's board of directors voted unanimously to effect a spin-off of Panhandle's production and exploration assets by distributing one share of Anadarko common stock for each issued and outstanding share of Panhandle stock held of record on September 12, 1986. The date for distribution of the stock dividend was set at October 1, 1986. To advise Panhandle's shareholders and the market place of the impending spin-off, Panhandle and Anadarko issued an Information Statement for Anadarko Common Stock ("Information Statement") dated August 29, 1986. Further, on September 18, 1986, Panhandle furnished a list of its stockholders of record as of September 12, to Anadarko's transfer agent to facilitate the distribution of the stock dividend.

In order to enhance the value of the spin-off, representatives of Panhandle and Anadarko met with representatives of the New York Stock Exchange for the avowed purpose of creating a market for Anadarko stock prior to the date of distribution. The New York Stock Exchange approved the application and trading began in Anadarko stock on September 8, 1986. From September 8, 1986, to October 1, 1986, Panhandle and Anadarko stock were traded in essentially three forms. First, Panhandle's stock was traded the "regular way" reflecting the combined value of Panhandle and Anadarko. A share of Panhandle traded the regular way included a due bill which required the seller to deliver to the buyer the Anadarko stock dividend if and when it was distributed. Second, Panhandle stock was traded "ex-distribution." This form of trading reflected only the value of Panhandle, with the seller retaining the right to the Anadarko stock dividend. Finally, trading in Anadarko stock was effected on a "when-issued" basis, reflecting the value of Anadarko as an independent entity. Between September 8 and October 1, approximately three million shares of Anadarko shares were traded on a when-issued basis; one million of Panhandle shares were sold on an ex-distribution basis; and more than five million shares of Panhandle were traded the regular way.

Following board approval of the spin-off dividend, Panhandle began restructuring existing contracts between Panhandle and Anadarko. Initially an effort was made to modify the existing contracts through negotiations between the operating staffs of Anadarko and Panhandle. On September 11, Anadarko's board approved modifications to a prior "take or pay" agreement, requiring Anadarko to reduce the advance price of gas sold to Panhandle on a short term basis. After failing to modify the remaining agreements through negotiations, on September 30, 1986, Anadarko's board of directors met to resolve all the outstanding impasse issues relating to the spin-off.

Five of the then seven Anadarko directors participated in the September 30 board meeting. Only one director, James T. Rodgers ("Rodgers"), was not affiliated with Panhandle or one of its subsidiaries. At the meeting Rodgers was joined by Robert J. Allison, Jr., ("Allison") a director of both Anadarko and Panhandle, in protesting the terms of the disputed agreements as being unfair to Anadarko. Further, the board was advised by Anadarko's General Counsel that it owed a fiduciary duty to Anadarko's prospective stockholders which would be breached if the board approved the unfair contracts.

The disputed agreements were approved by Anadarko's board by a 3–2 vote. (Rodgers voted against all of the modifications and Allison voted against five and abstained on one). Following the approval of the agreements the three inside directors [1]

---

**1.** The three inside directors R.D. Hunsucker, R.C. Dixon, and R.L. O'Shields were the majori-

resigned, effective October 1, 1986, and were replaced by four new directors. The newly constituted board reviewed the disputed agreements and based on an opinion by outside counsel that the contracts were unfair and voidable, the board voted unanimously to rescind the agreements.[2]

## II

The linchpin of Anadarko's attack on the terms of the disputed agreements is the claim that the agreements were crafted adversely to Anadarko's interests by entities who were in a fiduciary relationship to Anadarko's prospective shareholders. This assertion assumes significance because if such a relationship exists Panhandle and its designated directors are required to demonstrate the entire fairness of the disputed agreements. *See Sinclair Oil Corporation v. Levien,* Del. Supr., 280 A.2d 717, 720 (1971); *see also Sterling v. Mayflower Hotel Corp.,* Del.Supr., 93 A.2d 107, 110 (1952); *Gottlieb v. Heyden Chemical Corp.,* Del.Supr., 91 A.2d 57, 58 (1952).

 It is a basic principle of Delaware General Corporation Law that directors are subject to the fundamental fiduciary duties of loyalty and disinterestedness. Specifically, directors cannot stand on both sides of the transaction nor derive any personal benefit through self-dealing. *Guth v. Loft, Inc.,* Del.Supr., 5 A.2d 503 (1939); *Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984); *Marciano v. Nakash,* Del.Supr., 535 A.2d

400, 403 (1987). However, in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders. *See Sinclair Oil Corporation v. Levien,* 280 A.2d at 720; *Goodman v. Futrovsky,* Del.Supr., 213 A.2d 899, 902 (1965).

Anadarko acknowledges that a parent does not owe a fiduciary duty to its wholly owned subsidiary. However, Anadarko argues that Panhandle's actions relating to the spin-off have established a class of stockholders to whom fiduciary duties are owed. Specifically Anadarko contends that by setting a record date for the dividend distribution and by establishing a market for Anadarko shares to be traded on a when-issued basis, Panhandle has created a fiduciary relationship with the prospective shareholders of Anadarko. As a result, Panhandle and the inside directors of Anadarko have assumed responsibility for demonstrating that the agreements are entirely fair to Anadarko's new shareholders—a formidable burden in view of the obvious one-sidedness of the agreements.

 Anadarko first argues that record ownership passed to Anadarko's prospective stockholders as of September 12, the record date for the stock dividend. The argument follows that as record owners, the prospective stockholders of Anadarko were owed fiduciary duties by Panhandle and Anadarko's former directors. In sup-

---

ty votes in approving the disputed agreements and constitute the individual defendants in this case. R.D. Hunsucker was Panhandle's president and chief executive officer; R.L. O'Shields was chairman of Panhandle's board of directors; and R.C. Dixon was an officer and director of two Panhandle subsidiaries, Pipeline and Trunkline.

2. A detailed review of the disputed agreements is not required for an understanding of the issues presented on this appeal. Essentially, Anadarko alleges that the disputed agreements: (1) require Anadarko to reduce its price of gas to Trunkline to $2.21/mm Btu for a fixed period, without any consideration and without the protection of the termination clause that Trunkline had made available in contracts with other producers; (2) require Anadarko to settle Panhandle's monetary obligations for past contractual nonperformance

for less than ten cents on the dollar and further permanently reduce the price of Anadarko's gas to Trunkline; (3) require Anadarko to indemnify Panhandle against liability for Panhandle's breach of its obligations to third parties under a stipulation and agreement with the Federal Energy Regulatory Commission; (4) grant Panhandle contractual rights amounting to an exclusive option to take or refuse gas from Anadarko's most valuable gas reserve (Matagorda Island Blocks 622 and 623) and thereby expose Anadarko to the serious risk of uncompensated drainage during the term of the option; and (5) require Anadarko to indemnify Panhandle for potential liability to Sonatrach, the state-owned petroleum company of Algeria, in the amount of several billion dollars. Appellant's Opening Brief at 10.

port of this argument, Anadarko relies on the fact that the disputed agreements were approved after the record date and that a stock ledger had been prepared and delivered to a transfer agent. We do not view the passing of the record date and preparation of a stock ledger as determinative of the nature of the relationship.

Anadarko correctly states that Delaware law provides that the "stock ledger shall be the only evidence as to who are the stockholders entitled to examine the stockledger, ... or the books of the corporation, or to vote in person or by proxy at any meeting of the stockholders." 8 *Del.C.* § 219(c); *see Rainbow Nav. v. Pan Ocean Nav.,* Del.Supr., 535 A.2d 1357, 1359 (1987). The stock ledger referred to in section 219 and in the cases interpreting it, refer to a listing of present stockholders of existing entities. In this case the stock ledger relied on by Anadarko was not a list of Anadarko stockholders but was instead a list of Panhandle stockholders as of September 12. As the Chancery Court noted, the preparation of the stock list and the subsequent delivery to the transfer agent was done merely to facilitate the stock distribution plan for October 1, 1986 and did not serve to pass record ownership to Panhandle's stockholders. Thus, the existence of a stock ledger containing the names of Panhandle's stockholders as of September 12, who had an expectation of becoming Anadarko shareholders at a future specified date, does not provide a valid basis to impose fiduciary duties on Panhandle and Anadarko's former directors.

■ Anadarko's next argument presents a more substantial issue, i.e., whether beneficial ownership of Anadarko stock passed to Panhandle's stockholders of record and to those who purchased Anadarko stock on a when-issued basis. Anadarko relies on two assertions in support of its beneficial

ownership argument; first, Panhandle's stockholders of record had a vested contractual right to the dividend of Anadarko stock; and second, the trading in Anadarko stock prior to the date of distribution created a beneficial interest distinct from Panhandle's legal interest in Anadarko.[3]

■ The general rule regarding the vesting of cash dividends is that a contractual right of the stockholder to the dividend becomes fixed upon the declaration of the dividend. Thus, upon a valid declaration of a dividend the corporation becomes indebted to the stockholder, and the stockholder may recover the declared amount in an action, *ex contractu*, against the corporation. *See Wilmington Trust Co. v. Wilmington Trust Co.,* Del.Ch., 15 A.2d 665 (1940); *Selly v. Fleming Coal Co.,* Del.Super., 180 A. 326 (1935). However, the same rule does not extend to stock dividends.

■ In the context of a stock dividend, the nature of the res distributed and the shareholders' right to and interest in the dividend are less certain. The value of the underlying asset to be distributed, i.e., a proportionate interest in the equity of the corporation, may fluctuate between the date of declaration and date of distribution as a result of market forces and/or management decisions. Thus, the corresponding right to the stock dividend is not compromised by foreseeable changes in the inherent value of the underlying corporation. Given the inherent risk of possible change in equity value, the stock interest held by Anadarko's prospective stockholders does not support the conclusion that a separate class of beneficial stockholders has been created by the declaration of the spin-off dividend.

■ Andarko next argues that a distinct beneficial interest was created in Anadarko stock as a result of trading on the New

---

**3.** In support of its argument that Anadarko's prospective stockholders were beneficial owners, Anadarko also relies, by analogy, on section 16(a) of the Securities Exchange Act of 1934, under which the Securities and Exchange Commission has ruled that beneficial ownership of a dividend stock is acquired on the record date. We are not persuaded by this argument. The

definition of "beneficial ownership" under the 1934 act facilitates the broad disclosure function of section 16(a). This expansive definition does not comport with the rationale and purpose of establishing fiduciary duties under Delaware corporate law, and thus will not be adopted in this case.

York Stock Exchange in Anadarko and Panhandle stock. Anadarko contends that individuals who bought Anadarko stock on a when-issued basis acquired an interest in Anadarko and not in Panhandle. Similarly, individuals who sold their Panhandle stock on an ex-distribution basis relinquished ownership of Panhandle but retained an interest in Anadarko. The result, as Anadarko contends, is that a beneficial interest in Anadarko was created that was distinct from Panhandle's stockholders' interest in Panhandle individually and as the parent corporation of Anadarko. While we agree that a distinct interest was created by providing a market for Anadarko stock prior to distribution, we conclude that the interest does not rise to the level of a beneficial interest for purposes of imposing fiduciary duties on Panhandle and Anadarko's former directors.

The concept of "beneficial ownership" of stock, though somewhat inexact, is contextually defined, and has become a term of art for purposes of establishing fiduciary duties under Delaware law. *See Sundlun v. Executive Jet Aviation, Inc.*, Del.Ch., 273 A.2d 282, 285 (1970). As applied in this case, beneficial ownership contemplates a separation of legal and equitable ownership. Under this concept, the equitable or beneficial owner possesses an economic interest in the subject property distinct from legal ownership or control. *Id. See, e.g., State v. Sperry Corporation*, Del.Super., 15 A.2d 661 (1940) (equitable or beneficial owner of stock is not entitled to compel inspection of corporate records); *Rosenthal v. Burry Biscuit Corporation*, Del. Ch., 60 A.2d 106 (1948) (equitable owner of stock is a "stockholder" for purposes of maintaining a derivative action in a court of equity).

The separation of legal and equitable ownership is lacking in this case. Until the date of distribution, both legal and equitable title remained with Panhandle as the parent of a wholly owned subsidiary. As noted by the Vice Chancellor, Panhandle continued as Anadarko's record owner and, as such, had voting control of Anadarko stock until the date of distribution. The question of beneficial ownership, however,

is less clear and requires an examination of the expectancy interest held by Anadarko's prospective stockholders.

The nature and scope of the expectancy interest held by Anadarko's prospective stockholders is addressed in the Information Statement issued prior to the spin-off of Anadarko. Regarding Panhandle's relationship with Anadarko the Information Statement clearly states that it can be expected that the companies will enter into agreements concluding long-term negotiations providing for adjustments to the terms of certain gas purchase and related contracts. Further, the Information Statement specifically provides:

> These adjustments will include, among other things: (1) the settlement by the Company of claims for "take-or-pay" payments for prior periods; (2) interim price reductions under, and a procedure for the renegotiation of all gas purchase contracts between Anadarko and Trunkline involved in Trunkline's program to obtain price and volume relief on a long-term basis; (3) the implementation of new or amended contracts covering gas produced by Pan Eastern from Matagorda Island Blocks 622 and 623; (4) the implementation of new arrangements with respect to the Kansas intrastate pipeline system of Production (which will remain a subsidiary of PEC) providing, among other things, for the renegotiation of all gas purchase agreements between Production and Anadarko effective April 1988; and (5) amendments to certain gas processing and other contracts.

Significantly, the Information Statement concludes that the adjusted gas purchase agreements will likely result in "contractual terms as to price, 'take or pay' obligations and other matters" which are not as favorable to Anadarko as the terms of its present contracts with Panhandle.

Through the Information Statement, Anadarko's prospective stockholders were thus on notice that Panhandle continued to exercise both legal and equitable ownership of Anadarko and that this ownership would be used to effect contractual arrangements

between the two companies. Indeed the contractual modifications complained of in this case were the subject of specific comment in the Information Statement. Panhandle's stockholders and those who purchased Anadarko stock on a when-issued basis could not reasonably expect a continuation of the status quo nor did they have any assurance of a protected financial interest in Anadarko prior to the date of distribution. It cannot be claimed, therefore, that Panhandle purported to act in a fiduciary role to protect Anadarko's prospective stockholders from the risk that changes would occur prior to the distribution date.

■ Finally, Anadarko argues that as of the record date for distribution, September 12, 1986, Panhandle and Anadarko's directors held Anadarko stock in trust for the prospective stockholders of Anadarko. Specifically, Anadarko contends that as trustees, Panhandle and the Anadarko board had a general fiduciary duty to preserve the value of the corpus of the trust, i.e., the Anadarko stock. *See, e.g., Lockwood v. OFB Corp.*, Del.Ch., 305 A.2d 636 (1973). In support of its argument, Anadarko relies on *Sherry v. Union Gas Utilities, Inc.*, Del.Ch., 171 A. 188, 190 (1934) which states: "[w]hen a dividend has been declared and moneys deposited for its payment, it has been determined that such deposit ... is affected with a trust in favor of stockholders."[4] This argument which, again, proceeds on a cash dividend analogy is not persuasive.

In order for a trust relationship to exist there must be evidence of an intention on the part of the grantor to separate legal and equitable title to the subject of the trust. *See Bodley v. Jones*, Del.Supr., 32 A.2d 436, 438 (1943); *see also* I *Scott on Trusts* § 2.3 (4th ed.). As previously discussed, this division of interests does not exist in this case. To the contrary, Panhandle, through its actions and public disclosures in the Information Statement, has indicated its intention that Anadarko would

continue to be its wholly owned subsidiary until the date of distribution.

The holding in *Sherry v. Union Gas Utilities, Inc.* relied on by Anadarko in support of its trust argument turns upon the intent of the corporation in depositing funds payable to bondholders. This evidence of intent to separate legal and equitable title is lacking in this case since there is no indication that Anadarko shares were deposited or set aside prior to the date of distribution. The absence of evidence of intent to separate legal and equitable title to Anadarko precludes any implication of a trust relationship in this case.

We hold, therefore, that the Court of Chancery properly concluded that a fiduciary relationship did not exist between Panhandle and Anadarko's prospective stockholders. Accordingly, the decision granting summary judgment is AFFIRMED.

## ON MOTION FOR REARGUMENT OR REHEARING EN BANC

### Submitted: July 8, 1988

Anadarko seeks reargument on related contentions. First, Anadarko argues that by relying on the Information Statement to support the conclusion that a fiduciary relationship did not exist between Anadarko's directors and its prospective stockholders, this Court has implicitly recognized the proposition that disclosure can relieve a director of the duty of loyalty. Second, Anadarko contends that if disclosure can relieve a director of the duty of loyalty, it is important for this Court, upon reconsideration, to establish a clear test for adequacy of disclosure. Finally, Anadarko seeks the opportunity to litigate the factual adequacy of disclosure upon remand to the Court of Chancery.

Contrary to Anadarko's claims, the ruling in the principal opinion, when confined to its specific facts, is not inconsistent with a director's duty of loyalty nor does it stand for the proposition that disclosure is a substitute for loyalty. As the opinion

---

4. In *Sherry* the Court of Chancery resolved a dispute over interest payments on corporate bonds by adopting an analogous theory which imposed a trust on dividends deposited for payment in favor of the record date stockholders.

makes clear, under the circumstances of this case the corporate parent's ownership interest was not legally divisible before the date of distribution for purposes of imposing fiduciary duties on Anadarko's former directors. The relevant inquiry is thus twofold: to whom is the fiduciary duty owed and at what time. Our ruling is specifically confined to Anadarko's claim that, under Delaware corporate law, a fiduciary relationship existed between Anadarko's board and its prospective stockholders prior to the issue date of the expected shares. We have concluded that the duty of loyalty arises only upon establishment of the underlying relationship.

Finally, we note that the viability of Anadarko's claim of nondisclosure, assertable as a federal cause of action, is not before us. Our ruling is confined to claims against corporate directors arising out of an alleged fiduciary relationship.

Given the narrow confines of our holding we find no basis for reargument. Accordingly, the motion for reargument is DENIED.