Mario TURTUR, Chris Turtur & Steve Turtur, Plaintiffs–Appellants,

v.

ROTHSCHILD REGISTRY INTERNATIONAL, INC., Rothschild Reserve I, International, D.C. Equipment Leasing Corp, American National Associates 367, Paragon Financial, Ltd., Cornick, Garber & Sandler, National Union Fire Insurance Company of Pittsburgh, Pa, Barry H. Trupin, Defendants,

Stein, Bliablias, McGuire, Pantages & Gigl, Defendant–Appellee.

No. 1126, Docket 93–7966.

United States Court of Appeals, Second Circuit.

Argued Feb. 16, 1994.

Decided June 7, 1994.

United States District Court for the Southern District of New York. We affirm.

## I.

The Turturs were licensed securities brokers residing in Texas who were officers in the securities firm of Turtur and Associates, Inc. ("the Turtur firm"), which Mario Turtur had formed in 1982. Late that year, Rothschild Registry International, Inc. ("Rothschild") approached the Turtur firm to assist in the selling of tax-advantaged limited partnerships that leased computer equipment. Mario Turtur retained a securities lawyer to investigate Rothschild's background and activities as a promoter of limited partnerships. Thereafter, the Turtur firm agreed to sell on Rothschild's behalf various limited partnership units.

In the course of their investigation of Rothschild and of their efforts on Rothschild's behalf, the Turturs learned that the Internal Revenue Service ("the IRS") had questioned various Rothschild equipment leasing limited partnerships and, in some cases, had disallowed related tax deductions. Nevertheless, the Turturs themselves became interested in investing in "Chase Associates," one of the partnerships Rothschild was promoting. Chase Associates was a limited partnership organized under the laws of New York. The Turturs received and reviewed a private placement memorandum ("the PPM") and a tax opinion relative to Chase Associates. The tax opinion was prepared by the New Jersey law firm of Stein, Bliablias, McGuire, Pantages & Gigl ("the Stein firm").

When the Turturs sought to invest in Chase Associates, John Prowant, an officer of Rothschild, told them that Chase Associates was fully subscribed but that another partnership, this one called "American National Associates 367" ("ANA 367"), would soon be available. According to Mario Turtur, Prowant "let [him] understand that A & A [sic] 367 would be basically the same kind of deal" as Chase. (In a subsequent affidavit, Turtur

Neal Schwarzfeld, New York City, David S. Frydman, Schwarzfeld, Ganfer & Shore, NY, for plaintiffs-appellants.

Marc S. Dreier, New York City, Charles S. Joseph, Evan K. Kornrich, Fulbright & Jaworski L.L.P., NY, for defendants-defendant-appellee.

Before: NEWMAN, Chief Judge, CAMPBELL *, Senior Circuit Judge, and MAHONEY, Circuit Judge.

LEVIN H. CAMPBELL, Senior Circuit Judge:

Mario Turtur and his two sons, Chris and Steve, plaintiffs below, appeal from the entry of summary judgment against them in the

---

* The Honorable Levin H. Campbell, United States Court of Appeals for the First Circuit, sitting by designation.

elaborated that Prowant "specifically assured [me] that the substance of the offering documents and tax opinion would be identical to those presented in another offering with which I was personally familiar and had read the underlying documents.") Based on Prowant's assurances, and relying on the offering materials prepared for Chase Associates, the Turturs invested in ANA 367 in December 1982. They did so before receiving or reading the PPM or tax opinion prepared for ANA 367.

As it turned out, the offering documents and the tax opinion in respect to ANA 367 were identical in all material respects to the offering documents and tax opinion for Chase Associates.[1] The PPM for ANA 367 included a disclaimer, stating in capital letters that prospective investors should rely only upon representations contained in the ANA 367 documents:

NO OFFERING SHALL BE MADE BY MEANS OF ANY LITERATURE OR ADVERTISING EXCEPT THE INFORMATION CONTAINED HEREIN. NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OR GIVE ANY INFORMATION WITH RESPECT TO THIS OFFERING, EXCEPT FOR THE INFORMATION CONTAINED HEREIN, AND NO OFFEREE MAY RELY ON ANY REPRESENTATION OR INFORMATION THAT MAY BE MADE OR GIVEN IN VIOLATION OF THE ABOVE.

Under the terms of its PPM, ANA 367 was to purchase computer equipment from D.C. Equipment Leasing Corp. ("D.C. Leasing"), subject to certain user leases, for approximately $6.2 million. ANA 367 would then enter into a long-term lease agreement with Paragon Financial, Ltd. ("Paragon"), which had previously sold the equipment to D.C. Leasing for approximately $5.7 million after acquiring it from yet another company, Comdisco, Inc., for approximately $4.7 million.

The Stein firm prepared the tax opinion for ANA 367, and the Turturs claim that the Stein firm also helped author the PPM for ANA 367.

The ANA 367 deal was quite risky, as its success hinged, among other things, on whether the IRS would allow the positive tax status of the investment. This determination would depend on IRS rulings as to the valuation attributed to the equipment, the partnership's basis in the equipment, and D.C. Leasing's independence from the partnership. The PPM and the tax opinion for ANA 367 contained much cautionary language as to the various risks.

As it turned out, in 1987 the IRS informed Mario Turtur that it was disallowing various deductions and losses he had claimed on the basis of his investment in ANA 367. In 1990, the IRS advised Steve Turtur that his deductions with respect to ANA 367 were disallowed. Chris Turtur acknowledges that the IRS has never advised him that his deductions for ANA 367 have been disallowed.

In December 1987, the Turturs brought a complaint in the Texas state court, alleging a violation of the Texas Securities Act, a violation of the Texas Consumer Protection Act, and common law fraud. They named a large number of defendants, including Rothschild, Paragon, D.C. Leasing, the Stein firm, and ANA 367 itself. Defendants removed the case from the Texas state court to the United States District Court for the Southern District of Texas. The district court dismissed the Texas state law claims, holding that New York law applied in accordance with the parties' arrangement in the limited partnership agreement.

Over time, all of the defendants except for the Stein firm were dismissed from the action. Almost five years after the Turturs had filed their original complaint, the district court, in November 1992, *sua sponte* dismissed the claim against ANA 367 for plaintiffs' failure to prosecute the claim[2]—service

---

1. There is evidence that the Stein firm had prepared tax opinions for thirty-two tax shelter partnerships formed by Rothschild. The tax opinions all appear to have been essentially the same.

2. The court dismissed ANA 367 pursuant to Federal Rule of Civil Procedure 41(b), which reads:

**(b) Involuntary Dismissal: Effect Thereof.** For failure of the plaintiff to prosecute or to comply with these rules or any order of the court, a defendant may move for dismissal of an action or of any claim against the defendant. Unless the court in its order for dismiss-

had been imperfect, ANA 367 had never filed an appearance, and the Turturs had never moved for a default judgment. Once the Stein firm was left as the sole defendant, the district court transferred the remaining common law fraud claim to the United States District Court for the Southern District of New York.

This remaining claim, against the Stein firm, was dismissed on summary judgment in August 1993. The district court found that the Turturs failed to establish, as required by New York law in a claim for common law fraud, their "actual, direct reliance upon the alleged misrepresentations made in connection with ANA 367." The fatal flaw in the Turturs' claim, according to the district court, was that they had never actually seen, much less relied on, the supposed misrepresentations that appeared in the ANA 367 offering materials.

On appeal, the Turturs argue that the district court erred in granting summary judgment, as their reliance on the Chase Associates documents was sufficient to support a fraud claim against the Stein firm. In addition, though they failed to raise the issue below, the Turturs argue that the federal district court did not have jurisdiction, as the presence of ANA 367 as a defendant, until its dismissal in November 1992, destroyed complete diversity. We address the jurisdictional point first and then move to the merits.

## II.

The Turturs contend that by reason of the Supreme Court's decision in *Carden v. Arkoma Assocs.*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157 (1990), the presence of ANA 367 as a defendant in this action destroyed diversity jurisdiction. In *Carden*, the Supreme Court held that, for diversity purposes, a limited partnership is a citizen of each jurisdiction in which any of its limited partners is a citizen. *Id.* at 195–96, 110 S.Ct. at 1021. The rule in *Carden* would destroy diversity in this action because at least three of ANA 367's limited partners, the plaintiff-appellants, are citizens of Texas. Hence both the

plaintiffs and the partnership are citizens of the same state. The Turturs argue that after *Carden* was decided in 1990, the district court ceased to have jurisdiction, was "obligated" to remand the action to the Texas state court, and was powerless to dismiss ANA 367 from the case in 1992.

 Even though appellants failed to raise this jurisdictional issue below, we must consider it, as "subject matter jurisdiction is an unwaivable *sine qua non* for the exercise of federal judicial power." *Curley v. Brignoli, Curley & Roberts Assoc.*, 915 F.2d 81, 83 (2d Cir.1990) (citations omitted), *cert. denied,* 499 U.S. 955, 111 S.Ct. 1430, 113 L.Ed.2d 484 (1991). Nevertheless, the Stein firm argues that an application of *Carden* at this stage of the case would give the plaintiff-appellants an undeserved windfall: after more than six years of proceedings, after a failure to prosecute the alleged non-diverse party, and after waiting for an outcome in federal court and having their claims dismissed in their entirety, the Turturs would now be able to begin again in state court. The Stein firm urges this court to mitigate the harshness of such an application of *Carden* by pursuing, as this court did in *Curley*, its " 'obligation to explore any promising avenue to the District Court's jurisdiction.' " *Curley*, 915 F.2d at 85 (quoting *Association of Am. Medical Colleges v. Califano*, 569 F.2d 101, 111 (D.C.Cir. 1977)).

In *Curley*, certain limited partners brought a derivative action in federal court against a limited partnership, the general partner, and the general partner's controlling shareholder for various breaches of fiduciary duty. 915 F.2d at 82–83. Federal subject matter jurisdiction was based on diversity. After judgment for the plaintiffs, and during the pendency of the appeal to this court, the Supreme Court rendered its decision in *Carden*. Defendants then argued that the judgment should be vacated, as diversity jurisdiction was not available, plaintiffs and the defendant limited partnership being citizens of the same state. *Id.* at 84.

al otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of

jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

In order to maintain jurisdiction, this court determined that plaintiffs could have brought a class action rather than a derivative action, *id.* at 85–87, and recharacterized the derivative claim as a class claim, *id.* at 87–88. This court then determined that the defendant limited partnership was a dispensable party under Fed.R.Civ.P. 19 and could be dropped from the litigation, thus establishing complete diversity and sustaining jurisdiction. *Id.* at 88–92.

In doing so, this court noted that the Supreme Court had "ratified the predominant view that circuit courts have the power, even after judgment has been rendered below, to dismiss a dispensable party whose presence prevents statutory diversity jurisdiction." *Id.* at 88 (citing *Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989)). This power, according to *Newman–Green,* 490 U.S. at 833, 109 S.Ct. at 2223, and *Curley,* 915 F.2d at 89, is based on Fed.R.Civ.P. 21, which states in pertinent part: "Misjoinder of parties is not ground for dismissal of an action. Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just."

Plainly, the power to dismiss a dispensable party "should be exercised sparingly" by an appellate court, which should at all times "carefully consider whether the dismissal of a nondiverse party will prejudice any of the parties in the litigation." *Newman–Green,* 490 U.S. at 837–38, 109 S.Ct. at 2225. Upon consideration, we think that the present case represents one of the infrequent situations in which it is appropriate to exercise this power. As in *Curley,* dismissal of the nondiverse dispensable party "is particularly appropriate in this case." 915 F.2d at 89. Dismissal does not prejudice the plaintiffs, who failed for almost five years to prosecute their claim against the nonappearing, non-diverse party, and it will spare the parties and the courts the necessity of relitigation.

We are convinced, as well, that ANA 367 is a dispensable party under Rule 19.[3] While doubtless a party that, within the meaning of Rule 19(a), should be joined "if feasible," ANA 367's presence destroys diversity and does so at a peculiarly awkward and unfair moment in this proceeding. The correct inquiry is framed by Rule 19(b): whether "in equity and good conscience" this action should proceed without ANA 367. As this court said in *Curley,* " 'a court should take a flexible approach when deciding what parties need to be present for a just resolution of the suit. . . . [V]ery few cases should be terminated due to the absence of nondiverse parties unless there has been a reasoned determination that their non-joinder makes just resolution of the action impossible.' " 915 F.2d at 90 (quoting *Jaser v. New York Property Ins. Underwriting Ass'n,* 815 F.2d 240, 242 (2d Cir.1987)).

Under this standard, we see no good reason why ANA 367 should not be dismissed as

---

**3.** Federal Rule of Civil Procedure 19 reads in pertinent part:

 **(a) Persons to be Joined if Feasible.** A person who is subject to service of process and *whose joinder will not deprive the court of jurisdiction* over the subject matter of the action shall be joined as a party if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple or otherwise inconsistent obligations by reason of the claimed interest. . . .

 **(b) Determination by Court Whenever Joinder not Feasible.** If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, *the court shall determine whether in equity and good conscience* the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

(emphasis added).

a party to preserve diversity jurisdiction. The Turturs cannot seriously assert they will be prejudiced by the dismissal of an imperfectly served, nonappearing party against which they took no steps for nearly five years to prosecute their claim. Were we, at this late date, to dismiss the action for lack of jurisdiction and allow the Turturs another bite at the litigation apple, every other party would suffer the prejudice of relitigation.

Defendant-appellee is the present beneficiary of a judgment on the merits in its favor. Its "interest in preserving a fully litigated judgment should be overborne only by rather greater opposing considerations than would be required at an earlier stage" of the litigation. *Curley,* 915 F.2d at 91–92 (quoting *Provident Tradesman Bank & Trust Co. v. Patterson,* 390 U.S. 102, 112, 88 S.Ct. 733, 739, 19 L.Ed.2d 936 (1968)). Such "greater opposing considerations" are not present here. In the circumstances, "we see no reason, at this belated juncture, to provide [appellants] with a 'windfall escape from [their] defeat' " in the courts below. *Id.* at 91 (quoting *Provident Tradesman,* 390 U.S. at 112, 88 S.Ct. at 739).

We accordingly affirm the dismissal of ANA 367 as a party defendant and confirm the existence of subject matter jurisdiction.

### III.

■ We turn now to Turtur's appeal from the grant of summary judgment against them on their claim against the Stein firm. Our review of a grant of summary judgment is *de novo,* and, as such, we apply the same standards as the district court. *Viacom Int'l, Inc. v. Icahn,* 946 F.2d 998, 1000 (2d Cir.1991), *cert. denied,* ⎯ U.S. ⎯, 112 S.Ct. 1244, 117 L.Ed.2d 477 (1992). Summary judgment is appropriate if the evidence offered, viewed in the light most favorable to the non-moving party, demonstrates that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When a defendant moving for summary judgment has pointed to the absence of evidence to support an essential element on which the plaintiff has the burden of proof, the plaintiff, in order to avoid summary judgment, must show the presence of a genuine issue by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in his favor, to establish the existence of that element at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c).

### A.

■ The Turturs argue, first, that under conflict of laws principles, their claim of common law fraud should be construed under Texas law rather than New York law. Like the courts below, we are unpersuaded by this argument. The subscription note by which each of the Turturs invested in ANA 367 provided that:

> [t]his note shall be governed by, and interpreted under, the laws of the State of New York applicable to contracts made and to be performed therein without giving effect to the principles of conflict of laws. The parties hereto consent to the exclusive jurisdiction of the courts of the State of New York to resolve any controversy or claim *arising out of or relating to* this contract or breach thereof. (Emphasis added).

The Turturs suggest that this choice of law agreement is insufficient, as their common law fraud claim against the Stein firm sounds in tort rather than contract. They cite one Texas state case, *State National Bank v. Academia, Inc.,* 802 S.W.2d 282 (Tex.Ct.App. 1990), for the proposition that contract claims can be governed by agreements between parties, but that, with respect to claims sounding in tort, a court is to utilize conflict of laws principles to determine which state's law applies.

*State National* is inapposite, however, as the agreement between the parties in that case was much narrower than the provision here. In *State National,* the promissory note at issue stated that its "validity, construction and enforcement" would be governed by Illinois law. 802 S.W.2d at 289. Here, in contrast, the Turturs agreed to be bound by a choice of law provision that covers any controversy "arising out of or relat-

ing to" the subscription. We agree with the Texas district court, which originally ruled on this issue, that this language is sufficiently broad to cover tort claims as well as contract claims "arising out of or relating to" the subscription.

■ As both New York and Texas recognize the right of contracting parties to agree to choice of law, and as the Turturs' fraud claim clearly "arises out of" or "relates to" their investment in ANA 367, we will apply New York law as provided in the subscription note. *See Tel–Phonic Services, Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1142 (5th Cir.1992) ("Texas recognizes the right of contracting parties to agree to choice of law.") (citing *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984)); *Freedman v. Chemical Constr. Corp.*, 43 N.Y.2d 260, 265 n. *, 401 N.Y.S.2d 176, 372 N.E.2d 12 (1977) ("As a general matter, the parties' manifested intentions to have an agreement governed by the law of a particular jurisdiction are honored.").

### B.

■ Under New York law, the essential elements of a common law fraud claim include "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987); *see also Albert Apartment Corp. v. Corbo Co.*, 182 A.D.2d 500, 500, 582 N.Y.S.2d 409, 410 (1st Dep't 1992). In granting summary judgment for the defendant, the district court focused on one element, reliance, and determined that there was no basis in the record to find the necessary reliance. We agree.

■ The Turturs face the obvious difficulty here that, as they concede, they never saw the tax opinion drafted by the Stein firm for ANA 367, or the PPM, before they invested.

The Turturs' argue, however, that this is immaterial. They say that they relied on the offering documents Stein had drafted for Chase Associates and the further representations of Prowant—which turned out to be true—that the substance of the ANA 367 documents would be identical to those presented in connection with Chase Associates.

The Turturs assert that under New York law, a claim for fraud may lie even when a plaintiff does not directly rely on a fraudulent representation made by the defendant, if (1) the plaintiff received the information from someone who had received it from the defendant, and (2) the defendant intended the misrepresentation to be conveyed to him. *See Rosen v. Spanierman*, 894 F.2d 28, 33–34 (2d Cir.1990); *Peerless Mills, Inc. v. American Tel & Tel. Co*, 527 F.2d 445, 450 (2d Cir.1975). The Turturs argue that both requirements are satisfied here. First, the essence of the Stein firm's tax opinion in the ANA 367 offering was, in effect, conveyed to them by Prowant when he told them that the "substance of the offering documents and tax opinion would be identical to those presented" in the Chase offering, the documentation of which the Turturs already had read. The Chase documents, according to the Turturs, contained the same fraudulent representations as the later ANA 367 documents. Second, while the Turturs concede that there is no evidence whatever as to the intent of the Stein firm in rendering the tax opinion for Chase Associates, the Turturs submit that it is only reasonable to conclude that the tax opinion was intended to be communicated to investors and that investors would rely on that tax opinion. The Turturs note that the Stein firm drafted over thirty essentially identical tax opinions for similar shelters.

The Turturs' argument depends on the linking of two separate sets of representations: first, the alleged misrepresentations in the offering documents for Chase Associates;[4] and second, the alleged assertion by

---

4. According to the Turturs' appellate brief, "The offering documents were false and misleading in a number of material respects, all of which related to the fact that, as a matter of virtual certainty, the promised tax deductions would not be available to investors." This was so, the Turturs' assert, because the price of the computer equip-

ment was grossly inflated, and the parties to the computer transaction had not been dealing in good faith and at arms length as required by the IRS. Appellants assert that the Stein firm either knew of the latter deficiency or had failed to make proper investigation before preparing its tax opinion.

Prowant—who was not a representative of the Stein firm—that the Chase Associates documents substantially described the prospects for ANA 367. As the Chase Associates documents on their face make no reference at all to ANA 367, they could not, by themselves, be reasonably relied upon as the basis of a decision to invest in ANA 367. The pivotal representation must be the second one: Prowant's representation that the legal documents would be materially the same, as in fact they turned out to be. From Prowant's representation and the factual context, we are asked to infer the Stein firm's intention to mislead investors as to ANA 367 via the Chase documents. *See Ostano Commerzanstalt v. Telewide Systems, Inc.,* 794 F.2d 763, 765–66 (2d Cir.1986) (common law fraud claim based on indirect reliance requires a misrepresentation and "notice in the circumstances of its making" that the misrepresentation be communicated to plaintiff) (citations and internal quotation omitted); *Peerless Mills,* 527 F.2d at 451 (for fraud claim based on indirect reliance, defendant must have made the misrepresentation "for the purpose of having it repeated in terms or communicated in substance to the [plaintiff]") (internal quotation omitted); Restatement (Second) of Torts § 533 (1977) (maker of misrepresentation may be subject to liability for loss to third party, if maker "intends or has reason to expect that its terms will be repeated or its substance communicated" to the third party).

The Turturs do not question that Prowant was acting for Rothschild, not the Stein firm. And while Stein, being the drafter, can be presumed to have known of the documents' similarity, plaintiffs point to no evidence that the Stein firm ever authorized, encouraged or expected anyone to tell investors that they could rely on the PPM and tax opinion in one venture as a sufficient basis for investing in another venture to which the earlier documents did not expressly refer. There is no evidence, moreover, that the PPM or tax opinion for ANA 367 even existed at the time the Turturs contend Prowant spoke to them about ANA 367. Prowant apparently made his own representation prior to the time the Stein firm had drafted the tax opinion for ANA 367.

For plaintiffs to prevail on their ANA 367 fraud claim against the Stein firm, we think it not enough that the Stein firm may have drafted both sets of documents and that they were substantially alike, absent some further evidence that Stein encouraged or reasonably expected or understood that Prowant, or others, would use documents prepared by the Stein firm expressly for Chase Associates to induce investors to invest in ANA 367, without any reference to ANA 367's own documents. The Chase Associates' PPM and tax opinion, as drafted by the Stein firm, contained no reference to the subsequent entity called ANA 367 nor was it worded so as to encompass other ventures. Only Prowant's representation, which, insofar as the record shows, was entirely unknown to the Stein firm, links the two entities. The cases cited by the plaintiffs allowing for indirect reliance all concern relevant representations passed along from the defendant to a third party knowing or having reason to believe that they would be repeated. Here, in contrast, no evidence exists to show that the Stein firm in any way endorsed or encouraged Prowant's pivotal representation to a potential investor encouraging reliance upon the legal papers drafted for the earlier partnership when deciding to invest in a later one.

To be sure, the Stein firm knew the documents were basically alike and is perhaps also chargeable with knowledge that investors would learn of the structural similarity between the various tax shelter entities. But without more, such facts fall short of proof that the Stein firm expected that offering documents clearly restricted to one partnership alone would be utilized and relied upon by investors as providing good reason to enter into another partnership.

The Stein firm's position is strengthened by the disclaimer clause found in the ANA 367 PPM. While the numbered page which presumably contained the same clause is inexplicably missing from the record copy of the Chase Associates PPM, Mario Turtur swore that the latter was identical in all material respects to the ANA 367 PPM, hence we may assume that the Chase Associates offering document likewise contained

that clause. The ANA 367 disclaimer states that "NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY REPRESENTATION OR GIVE ANY INFORMATION WITH RESPECT TO THIS OFFERING, EXCEPT FOR THE INFORMATION CONTAINED HEREIN, AND NO OFEREE MAY RELY ON ANY REPRESENTATION OR INFORMATION THAT MAY BE MADE OR GIVEN IN VIOLATION OF THE ABOVE." To the extent Prowant pointed to the Chase Associates's offering documents as reason to invest in ANA 367, his action was unauthorized under that clause, which the Stein firm allegedly prepared. The disclaimer thus further refutes any inference, from the facts presented, that the Stein firm intended or should have expected Prowant or others to utilize the legal papers drafted for one partnership as the basis for an investor to enter into another. Indeed, it would not have been reasonable for the Turturs to have relied simply on the Chase Associates tax opinion and PPM for definitive guidance concerning their investment in ANA 367. Like the court below, we hold that they may not rest a fraud claim against the Stein firm relative to ANA 367 simply on information explicitly prepared for those investing in a different partnership.

As the plaintiffs have failed to come forward with evidence that the Stein firm made the pivotal representation or intended or had reason to anticipate it would be made and passed on to the Turturs as a sufficient basis for their investing in ANA 367, there is no genuine issue of material fact as to the reliance element of their fraud claim. Defendant was, therefore, entitled to judgment as a matter of law.

We *affirm* the grant of summary judgment.

JON O. NEWMAN, Chief Judge, concurring:

The result we reach in this case might appear to some to be unduly harsh for defrauded investors and unduly kind to those making fraudulent misrepresentations, but, though I find the result troublesome, I am satisfied that it is ultimately sound in principle and a faithful application of governing New York law. Stripped to its essence, the case involves the following circumstances. A law firm renders a series of substantially similar opinions on substantially similar investment opportunities. The opinions are alleged to contain a material misrepresentation. An investor sees the opinion that concerns investment A, does not see the opinion that concerns investment B, and nonetheless puts money in investment B, after receiving truthful assurance from a third party that the investments are substantially similar and that the law firm's opinions are also substantially similar.

The Court rejects an investor's claim against the law firm, holding that the legal requirement of reliance on an allegedly fraudulent misrepresentation has not been shown.

As Judge Campbell's opinion cogently points out, there has in fact not been reliance by the investor on the law firm's opinion concerning investment B. Yet the law firm was perfectly willing to issue substantially similar opinions concerning both investments (indeed, 30 others) and was in all likelihood completely indifferent as to whether an investor read the firm's opinion relating to investment A or investment B. Why then should the firm not be liable for the alleged misrepresentation concerning investment A, since it was substantially similar to the opinion concerning investment B, in which the investor placed his money?

To answer that the investor read only the piece of paper relating to investment A and did not see the substantially similar piece of paper concerning investment B is a correct statement of the facts but a rather technical ground of defense, one that seems to prefer form to substance. In this context, however, observance of form has one distinct virtue: It eliminates all disputes as to just how similar the two (or more) investments and the two (or more) opinions concerning them really are. In this case, the investments are remarkably similar and so are the opinions, but cases will inevitably arise where the investor claims substantial similarity and the opinion preparer reasonably disputes the claim. Strict insistence that the investor see and rely upon the opinion concerning the precise investment in which he placed his money eliminates a needless ground of controversy.

Moreover, as Judge Campbell points out, the investor is on notice, from the legend on the private placement memorandum, that no offering is to be made by means of "ANY LITERATURE ... EXCEPT THE INFORMATION CONTAINED HEREIN." The law firm's opinion with respect to investment A was not contained in the private placement memorandum concerning investment B. Finally, there is no unfairness in holding those who undertake sophisticated investments and who later complain that they were misled by the language of a legal opinion, to make sure that they have read the opinion that concerns the precise investment in which they have placed their money, and not some other investment, no matter how similar.

For these reasons, I concur in Judge Campbell's opinion.