ROSELINK INVESTORS, L.L.C., a New Jersey Limited Liability Company, Zigmunt Wilf, Bne Associates, a New Jersey partnership, David Halpern, Davanne Realty Co., Inc., a corporation, and Andrew Abramson, Plaintiffs,

v.

Mark R. SHENKMAN and Charles R. Cumello, Defendants.

No. 01CIV7176(MBM).

United States District Court, S.D. New York.

May 19, 2004.

Jeffrey M. Garrod, Orloff Lowenbach Stifelman & Siegel, Roseland, NJ, for Plaintiffs.

Thomas J. Fleming, Patrick L. Gibson, Olshan Grundman Frome Rosenzweig & Wolosky, New York, NY, for Defendants.

## OPINION AND ORDER

MUKASEY, District Judge.

Plaintiffs Roselink Investors, L.L.C., Zigmunt Wilf, BNE Associates, David Halpern, Davanne Realty Co., Inc., and Andrew Abramson (collectively "Creditors") purchased Units offered in a private offering by Crown Books Corp. ("Crown Books") and Crownbooks.com ("CB.com"), a wholly-owned subsidiary of Crown Books responsible for Crown Books' Internet sales. Creditors purchased the Units in exchange for (i) a promissory note in a principal value equal to the purchase price of each Unit, and (ii) a warrant to purchase common stock in Crown Books at a fixed exercise price. Defendants Mark Shenkman and Charles Cumello were directors of CB.com. Creditors have sued defendants for breaches of fiduciary duties, fraudulent transfer, and tortious interference with contractual relations. Both parties have moved for summary judgment. For the reasons stated below, defendants' motion is granted.

## I.

Plaintiff Roselink Investors, LLC is a New Jersey limited liability company with its principal place of business in New Jersey. (Compl.¶ 4) Roselink's members reside in New Jersey or Pennsylvania. (*Id.*) Plaintiff Zigmunt Wilf resides in New Jersey. (*Id.* at ¶ 5) Plaintiff BNE Associates is a New Jersey partnership, and all its partners are residents of New Jersey. (*Id.* at ¶ 6) Plaintiff David Halpern resides in New Jersey. (*Id.* at ¶ 7) Plaintiff Da-

vanne Realty Co. is a New Jersey corporation with its principal place of business in New Jersey. (*Id.* at ¶ 8) Plaintiff Andrew Abramson resides in New Jersey. (*Id.* at ¶ 9) Defendant Mark Shenkman resides in Connecticut. (*Id.* at ¶ 10) Defendant Charles Cumello resides in Maryland. (*Id.* at ¶ 11) Therefore, subject matter jurisdiction arises under 28 U.S.C. § 1332(a)(1). Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events giving rise to this action occurred within this district.

## II.

The following facts are either undisputed or are presented in the light most favorable to plaintiffs. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)

Crown Books is a Delaware corporation based in Maryland. (*Id.* at ¶ 12) After becoming one of the country's top discount retailers of books and book-related products, Crown Books filed a voluntary petition for bankruptcy relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 (2000), in July 1998. (*Id.* at ¶ 12–13) Crown Books emerged from bankruptcy with two working capital loans provided by Paragon Capital LLC ("Paragon") and Foothill Capital Corporation ("Foothill"). (*Id.* at ¶ 14) Substantially all of Crown Books' assets were pledged to Creditors. (*Id.*)

In December 1999, Crown Books formed CB.com, also a Delaware corporation, a wholly-owned subsidiary that was to pursue an Internet retail sales strategy. (*Id.* at ¶ 16) Crown Books estimated that its total costs to implement this Internet strategy would range from $3 million to $7 million, excluding marketing expenses. (*Id.* at ¶ 17) To raise the necessary funds, Crown Books and CB.com extended a private offering to accredited investors on December 14, 1999. (*Id.* at ¶ 18) The private offering was for a minimum of ten and a maximum of 20 Units, each of which consisted of a three-year 6% subordinated promissory note to CB.com in the principal amount of $500,000, and a three-year warrant to purchase 183,824 shares of common stock of Crown Books at $2.72 per share. (Defendants' Statement Pursuant to Local Civil Rule 56.1 ("Deft.Stmt."), Ex. A at i)

About February 23, 2000, Creditors entered into subscription agreements with Crown Books and CB.com. (Compl.¶ 19) Creditors purchased Units with an aggregate principal amount of more than $1 million. (*Id.* at ¶ 20) The private offering closed in March 2000 after raising approximately $4 million, $1 million of which was transferred immediately to Crown Books from CB.com. (*Id.* at ¶ 25) By January 2001, the functionality of CB.com's website was about 80% complete. (*Id.* at ¶ 26)

In the latter part of 2000, Crown Books found itself with accelerated holiday inventory receipts, unplanned trade payments for these receipts, and sales trends that were lower than reflected in its business plan. (*Id.* at ¶ 27) On December 8, 2000, Crown Books entered into an agreement with Paragon and Foothill to seek capital to lower its debt. (*Id.* at ¶ 28) The agreement obligated Crown Books to pay $1.5 million on or before December 12, 2000, at least $2 million on or before January 10, 2001, and at least $1.5 million on or before February 15, 2001. (Deft. Stmt., Ex. G at 2) About December 11, 2000, Shenkman and Cumello authorized a loan of $1.5 million from CB.com to Crown Books ("the Loan"). (Compl.¶ 30) Two months later, Crown Books filed another voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (*Id.* at ¶ 36)

Plaintiffs have brought seven claims for relief against Creditors. Claim One is for breach of fiduciary duty. Claim Two is for

breach of the duty of loyalty. Claim Three is for breach of the duty of good faith. Claim Four is for common law wrongful transfer of funds. Claim Five is for violation of § 1304(a)(2) of the Delaware Uniform Fraudulent Transfer Act. Claim Six is for violation of § 1305(a) of the Delaware Uniform Fraudulent Transfer Act. Claim Seven is for tortious interference with contractual relations.

## III.

### A. Breach of Fiduciary Duty Claims

Creditors allege that defendants, as directors of CB.com, owed them fiduciary duties of due care, loyalty and good faith. (Compl.¶¶ 38, 45, 52) According to Creditors, defendants owed them fiduciary duties because CB.com was insolvent "when the Loan was made or was rendered insolvent by the Loan." (*Id.* at ¶ 38) Creditors claim that by making the Loan defendants breached their fiduciary duties. (*Id.* at ¶¶ 39–42, 46–49, 53–56) The threshold question is whether defendants owed Creditors any fiduciary duties. If so, the next question is whether defendants breached these duties. Delaware law, upon which the parties have relied, controls. *See Texaco A/S (Denmark) v. Commercial Ins. Co. of Newark, NJ,* 160 F.3d 124, 128 (2d Cir.1998) (parties' consent to application of forum law completes choice of law inquiry); *American Fuel Corp. v. Utah Energy Development Co.,* 122 F.3d 130, 134 (2d Cir.1997) (same).

### 1. Did defendants owe plaintiffs any fiduciary duties?

■ Under Delaware law, when one company wholly owns another, the directors of the parent and the subsidiary are obligated to manage the affairs of the subsidiary in the best interests only of the parent and its shareholders. *See Anadarko Petroleum Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171, 1174 (Del.1988) (dis-

missing subsidiary's claim against parent corporation and three former directors of the subsidiary for breach of fiduciary duty by modifying contracts between subsidiary and parent); Dennis J. Block, Nancy E. Barton & Stephen A. Radin, THE BUSINESS JUDGMENT RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS 376 (5th ed.2002). However, "where a corporation is operating in the vicinity of insolvency, a board of directors is not merely the agent of the residue risk bearers, but owes its duty to the corporate enterprise." *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.,* Civ. A. No. 12150, 1991 WL 277613, at *34 (Del.Ch. Dec. 30, 1991). Delaware law requires that directors

recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair) course to follow for the corporation may diverge from the choice that the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act.

*Id.* at n. 55. Once a corporation enters "the zone of insolvency," the directors owe fiduciary duties not only to the corporation's shareholders but to its creditors as well. *See Geyer v. Ingersoll Publications Co.,* 621 A.2d 784, 791 (Del.Ch.1992). This means that directors of a wholly-owned subsidiary, who otherwise would owe fiduciary duties only to the parent, also owe fiduciary duties to creditors of the subsidiary when the subsidiary enters "the zone of insolvency."

■ There is no dispute here that CB.com was at least within "the zone of insolvency" when defendants made the Loan. Indeed, the facts show that CB.com was insolvent from the moment it was formed. All of its $4 million of capital was acquired

through the private offering, in which promissory notes were issued in exchange for Units. (Plaintiffs' Counterstatement of Undisputed Facts ("Pl.Cstmt.") ¶¶ 18–23) Because Crown Books decided to raise the capital through loans rather than a stock offering, CB.com's liabilities exceeded its assets when the Units were issued, which rendered CB.com insolvent from inception. "[A]n entity is insolvent when it has liabilities in excess of a reasonable market value of assets held." *Geyer,* 621 A.2d at 789; *see also* BLACK'S LAW DICTIONARY 799 (7th ed.1999) (defining "insolvent" as "having liabilities that exceed the value of assets"). Therefore, CB.com owed Creditors fiduciary duties from the moment Creditors purchased the units.[1]

### 2. Did defendants breach their fiduciary duties to creditors?

■ The fiduciary duties of directors of a corporation are twofold, "generally characterized as the duty of care and the duty of loyalty." *Norlin Corp. v. Rooney, Pace Inc.,* 744 F.2d 255, 264 (2d Cir.1984). "The duty of care refers to the responsibility of a corporate fiduciary to exercise, in the performance of his tasks, the care that a reasonably prudent person in a similar position would use under similar circumstances." *Id.* "The second restriction traditionally imposed, the duty of loyalty, derives from the prohibition against self-dealing that inheres in the fiduciary relationship." *Id.*

■ Under Delaware law, to establish a breach of fiduciary duty, a plaintiff first must prove facts sufficient to overcome the presumption inherent in the business judgment rule. *See Cinerama, Inc. v. Technicolor, Inc.,* 663 A.2d 1156, 1162–64 (Del.1995); *Cede & Co. v. Technicolor, Inc.,* 634 A.2d 345, 360–61 (Del.1993); *Spiegel v. Buntrock,* 571 A.2d 767, 774 (Del.1990); *Citron v. Fairchild Camera & Instrument Corp.,* 569 A.2d 53, 64 (Del. 1989); *Smith v. Van Gorkom,* 488 A.2d 858, 872 (Del.1985). The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in honest belief that the action taken was in the best interests of the company." *Orman,* 794 A.2d at 19–20 (quoting *Aronson v. Lewis,* 473 A.2d 805, 811 (Del.1984)) (internal quotation marks omitted). Four elements define the business judgment rule presumption: (1) a business decision; (2) disinterestedness and independence; (3) due care; and (4) good faith. *See Cinerama,* 663 A.2d at 1162–64; *Cede,* 634 A.2d at 360–61; *Spiegel,* 571 A.2d at 774; *Citron,* 569 A.2d at 64; *Van Gorkom,* 488 A.2d at 872; *Aronson,* 473 A.2d at 811–816; *see also* Dennis J. Block, Nancy E. Barton & Stephen A. Radin, THE BUSINESS JUDGMENT RULE: FIDUCIARY DUTIES OF CORPORATE DIRECTORS 39, 85–88 (5th ed.2002). The presumption of the business judgment rule is rebutted in those rare

---

1. Defendants make the implausible argument that plaintiffs are not creditors of CB.com but rather investors, and that this distinction negates any fiduciary duties defendants might otherwise owe plaintiffs. (Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Def.Mem.") 23–27) Defendants concede that plaintiffs made a loan to CB.com, and yet argue that the loan was effectively an equity investment because it was made when CB.com had no assets, no revenue and no value capable of repaying the loan—i.e., when CB.com was insolvent. (*Id.* at 24) However, the financial condition of CB.com does not change the structure of the relationship between it and plaintiffs. A creditor is simply "[o]ne to whom a debt is owed." BLACK'S LAW DICTIONARY 375 (7th ed.1999). Issuance of a promissory note to plaintiffs by CB.com demonstrates an express recognition of a debt owed by CB.com to plaintiffs, and thus makes plaintiffs creditors of CB.com.

cases where a plaintiff establishes facts to show that any of the four elements was not present. *See Parnes v. Bally Entertainment Corp.*, 722 A.2d 1243, 1246 (Del. 1999). "While the Delaware cases use a variety of terms to describe the applicable standard of care, our analysis satisfies us that under the business judgment rule director liability is predicated upon concepts of gross negligence." *Aronson*, 473 A.2d at 812. Under Delaware law, a court should "reach conclusions as to the sufficiency of allegations regarding interest and independence only after considering all the facts alleged on a case-by-case basis." *Orman*, 794 A.2d at 23.

Creditors claim that defendants owed them fiduciary duties "not to divert, dissipate or unduly risk assets of Crownbooks.com that would be necessary to satisfy Crownbooks.com's repayment obligation with respect to the monies due on Plaintiffs' Notes." (Compl.¶¶ 38, 45, 52) Creditors argue that defendants breached their fiduciary duties "by making the Loan without first ensuring that Crownbooks.com had retained sufficient assets to pay its debts as they became due," "by failing to obtain adequate security for the Loan as well as other protections for Crownbooks.com as a lender and for Plaintiffs as creditors," and "by causing Crownbooks.com to make the Loan without first obtaining any assurance that Crown Books Corp. could obtain the other cash infusions required under its agreement with Paragon and Foothills." (*Id.* at ¶¶ 40–42, 47–49, 54–56) However, Creditors have failed to establish sufficient facts to rebut the presumption of the business judgment rule.

a. Business Decision

It is not disputed that the Loan was the product of a business decision on the part of defendants. Cumello stated in a letter dated December 22, 2000—quoted by Creditors in the Complaint—that the Loan was made in answer to the problem Crown Books was having with raising cash needed to remain "in satisfactory standing with Paragon." (Compl.¶ 29) Cumello further explained in a letter to Creditors dated January 2, 2001—also quoted by Creditors in the Complaint—that the Loan was made "for the working capital needs of the parent." (*Id.* at ¶ 31) Therefore, defendants' decision to make the Loan constitutes a "business decision" for the purposes of the business judgment rule.

b. Disinterestedness and Independence

The Delaware Supreme Court has defined "interest" under a business judgment rule analysis as meaning "that directors can neither appear on both sides of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally." *Aronson*, 473 A.2d at 812. Further, the benefit to a director must be material, *Cede*, 634 A.2d at 363, which means that it must be "significant enough, *in the context of the director's economic circumstances*, as to have made it improbable that the director could perform her fiduciary duties to the shareholders without being influenced by her overriding personal interest." *Orman*, 794 A.2d at 23 (internal quotation marks and ellipsis omitted) (emphasis in original).

The Delaware Supreme Court has defined "independent" under a business judgment rule analysis as meaning "that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. "In assessing director independence, Delaware courts apply a subjective 'actual person' standard to determine whether a 'given' director was likely to be affected in the same or similar circum-

stances." *McMullin v. Beran,* 765 A.2d 910, 923 (Del.2000). "There must be coupled with the allegations of control such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person." *Aronson,* 473 A.2d at 815. "To be disqualifying, the nature of the director interest must be substantial" and not merely "incidental." *Cinerama,* 663 A.2d at 1169. If a plaintiff successfully demonstrates facts sufficient to rebut the business judgment rule presumption, then the burden of proof shifts to the defendant directors to establish the "entire fairness" of the challenged transaction. *Kahn v. Lynch Communication Sys., Inc.,* 638 A.2d 1110, 1115 (Del.1994).

▮ Creditors argue here that both Cumello and Shenkman were personally interested in the Loan because "both Cumello and Shenkman had personal interests that were placed at grave risk by the prospect of a Crown Books' bankruptcy," and the Loan "enabled Crown Books to live for another day, and in turn, advanced their respective interests for their own personal benefit." (Pl.Mem.53) Creditors allege that defendants served as directors of both Crown Books and CB.com. (Compl.¶¶ 10–11) Creditors also note that Shenkman held ownership interests in two companies that together owned 35% of the common stock of Crown Books, and that Cumello received a salary as President and Chief Executive Officer of Crown Books. (Pl. Mem. at 53–54) In short, Creditors argue that defendants were not disinterested because they each had personal interests in Crown Books, thereby placing them on both sides of the transaction. However, presence on both sides of the

transaction does not automatically rebut the business judgment rule presumption. *Cullman,* 794 A.2d at 20 n. 36. The interests attributed to defendants by Creditors do not deprive defendants of the protection of the business judgment rule because of one essential fact overlooked by Creditors: Crown Books was the sole shareholder of CB.com.

▮ As already discussed, defendants, as directors of CB.com, owed fiduciary duties to CB.com's shareholders. CB.com's only shareholder, however, was Crown Books, as CB.com was a wholly-owned subsidiary. Therefore, defendants owed fiduciary duties to Crown Books as the only shareholder. Under Delaware law, "in a parent and wholly-owned subsidiary context, the directors of the subsidiary are obligated only to manage the affairs of the subsidiary in the best interests of the parent and its shareholders." *Anadarko Petroleum Corp. v. Panhandle Eastern Corp.,* 545 A.2d 1171, 1174 (Del.1988).[2] This means that defendants were obligated to consider the interests of Crown Books in any business decision they made, such as the decision to make the Loan. As a result, the personal interests attributed to defendants by Creditors did not extend beyond those that defendants were already obliged to consider because defendants had a fiduciary duty to consider the interests of Crown Books as the sole shareholder of CB.com. Indeed, given that Delaware law required defendants, as directors of a wholly-owned subsidiary, to consider the interests of the parent company, defendants would have been in breach of their fiduciary duties had they *not* considered the best interests of Crown Books in deciding whether to make the Loan.[3] Fur-

---

**2.** As discussed above, defendants also owed fiduciary duties to Creditors because CB.com was operating within the zone of insolvency.

**3.** Creditors, citing an unreported opinion from the Delaware Chancery Court, argue

that defendants had a fiduciary duty to run CB.com as a "stand-alone company" rather than managing it in the best interests of the parent company, Crown Books. However, the case cited by Creditors, *In re Student Loan Corp. Deriv. Litig.,* No. C.A. 17799, 2002 WL

ther, Creditors have not asserted any personal interests on the part of defendants relating specifically to the Loan. In fact, it is undisputed that the money CB.com loaned to Crown Books was transferred to Paragon, such that defendants did not receive any of the transferred funds nor any benefit from the funds other than some indirect, attenuated benefit from keeping Crown Books alive a bit longer, which they were legally obliged to try to do anyway.

Even assuming *arguendo* that the interests attributed to defendants by Creditors were additional interests beyond those defendants were obligated to consider, Creditors must also establish that these particular interests were material. *Cede*, 634 A.2d at 363. As explained below, Creditors have failed to do so.

First, Shenkman's purported ownership interest in Crown Books is far too attenuated to constitute a material interest sufficient to rebut the business judgment rule presumption. Shenkman is the founder, President, Chief Investment Officer and managing member of Shenkman Capital Management, Inc. ("Shenkman Capital"). (Plaintiffs' Statement of Undisputed Material Facts ("Pl.Stmt.") ¶ 8) Shenkman Capital is the managing member and 1% owner of Royalty Books Associates ("Royalty"). (*Id.* at ¶ 9) Royalty owned approximately 35% of Crown Books' stock. (*Id.*) Therefore, Shenkman's ownership interest in Crown Books is comprised of his unspecified ownership interest in Shenkman Capital, Shenkman Capital's 1% ownership interest in Royalty, and Royalty's 35% ownership interest in Crown Books— which makes Shenkman's ownership interest in Crown Books some percentage of 1% of 35%. Even assuming Shenkman owns 100% of Shenkman Capital, this would make his interest in Royalty only 0.35%. This is far too little to render Shenkman interested in the Loan or controlled by Crown Books under a business judgment rule analysis. "[S]tock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of dominion or control." *Aronson*, 473 A.2d at 815 (holding that 47% stock ownership was not sufficient to rebut independence) (internal quotation marks omitted).

Cumello's employment as an officer of Crown Books also does not constitute a material interest under the particular circumstances here. Creditors argue that Cumello's employment with Crown Books gives him a personal interest in keeping Crown Books out of bankruptcy for as long as possible in order to protect his job. However, as already discussed above, regardless of his position as an officer of Crown Books, Cumello had a duty to Crown Books to manage CB.com in the best interests of Crown Books, and certainly the best interests of Crown Books would include an interest in keeping Crown Books out of bankruptcy for as long as possible. As a result, any personal interest Cumello had in keeping Crown Books out of bankruptcy was consistent

---

75479 (Del.Chan.Ct.2002), is entirely inapposite because there the parent company owned 80% of the subsidiary, rather than owning 100%, as is the case here. *Id.* at *1. Where there are shareholders in addition to the parent company, both the directors of the subsidiary and the parent company, as controlling shareholder, have a duty to consider the interests of the minority shareholders. *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971). However, where the subsidiary is wholly owned by the parent, the directors of the subsidiary owe the parent a fiduciary duty to manage the subsidiary in the best interests of the parent. *Anadarko*, 545 A.2d at 1174. Here, not only are Creditors not shareholders of CB.com—an argument they have made at great length—but there are no shareholders besides Crown Books. Therefore, had defendants managed CB.com as a stand-alone company, disregarding the best interests of Crown Books, they likely would have been in breach of their fiduciary duties to Crown Books as the parent company.

with the best interests of Crown Books, and thus any indirect benefit to Cumello from the Loan was immaterial. Therefore, Creditors have failed to establish that defendants were personally interested in or dependent on the business decision to make the Loan.

### c. Due Care

 "The duty of the directors of a company to act on an informed basis forms the *duty of care* element of the business judgment rule." *Cinerama*, 663 A.2d at 1164 n. 13 (internal quotation marks and ellipsis omitted). "[T]o invoke the rule's protection directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Aronson*, 473 A.2d at 812. "[T]he standard for judging the informational component of the directors' decisionmaking does not mean that the Board must be informed of *every* fact. The Board is responsible for considering only *material* facts that are *reasonably available*, not those that are immaterial or out of the Board's reasonable reach." *Brehm v. Eisner*, 746 A.2d 244, 259 (Del.2000) (emphasis in original) "[T]he concept of gross negligence is [ ] the proper standard for determining whether a business judgment reached by a board of directors was an informed one." *Van Gorkom*, 488 A.2d at 873.

Creditors have failed to present any facts sufficient to overcome the business judgment rule presumption of due care. According to defendants, they consulted counsel for CB.com and Crown Books before making the Loan to discuss both legal and strategic concerns. (Cumello Dec. ¶¶ 22–26) Additionally, Cumello reports that as President and Chief Executive Officer of Crown Books, he "regularly received and reviewed financial reports and updates regarding Crown Books' finances," "reviewed Crown Books' monthly financial packages," and "had almost daily discussions with Crown Books CFO regarding Crown Books' credit facilities with Paragon and Ingram." (*Id.* at ¶ 41) It is unreasonable to conclude that as directors of Crown Books and as an officer of Crown Books, defendants would be uninformed about the financial condition of the company. Indeed, Creditors have posited conflicting arguments for this very reason. First, claiming that defendants were uninformed, Creditors argue:

> It is undisputed that defendants did not engage in any credit risk assessment to determine whether Crownbooks.com should have lent its cash assets to Crown Books and, in particular, Shenkman did not consider Crown Books' financial capacity to repay the Loan. No independent financial consultants or advisors were retained by defendants for the purpose of evaluating Crown Books' creditworthiness and capacity for loan repayment.

(Pl.Mem.41) In short, Creditors argue that defendants were not adequately informed about the financial condition of Crown Books, the recipient of the Loan. However, in the very next paragraph Creditors take a wholly contradictory position, arguing: "It is also undisputed that defendants *already knew, through their dual directorial status,* that Crown Books did not possess the *financial wherewithal* to repay, secure or otherwise guaranty repayment of Crownbooks.com's funds." (*Id.*) (emphasis added) Creditors then outline in detail the facts surrounding Crown Books' demise in late 2000 as defendants struggled to meet Paragon's demands. (*Id.* at 41–42) It is beyond any reasonable dispute that defendants were well aware of Crown Books' financial condition when the Loan was made, and thus were adequately informed in reaching the business judgment to make the Loan.

 Creditors' allegations boil down to a single contention: defendants made a

poor decision. Creditors argue that defendants should have ensured that CB.com "retained sufficient assets to pay its debts as they became due," obtained "adequate security for the Loan," and sought "assurance that Crown Books Corp. could obtain the other cash infusions required under its agreement with Paragon and Foothills." (Compl.¶¶ 40–42) However, all of these arguments are factual claims directed at the wisdom of defendants' decision rather than at the level of information underlying the decision. Under the business judgment rule, courts do not "examine the wisdom of the decision itself." *Brazen v. Bell Atlantic Corp.*, 695 A.2d 43, 49 (Del.1997). "[T]he Court gives great deference to the substance of the directors' decision and will not invalidate the decision, will not examine its reasonableness, and will not substitute [its] views for those of the board if the latter's decision can be attributed to any rational business purpose." *Paramount Communications, Inc. v. QVC Network Inc.*, 637 A.2d 34, 45 (Del.1994); *see also Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del.1971) ("A court under such circumstances will not substitute its own notions of what is or is not sound business judgment."); *Gagliardi v. TriFoods Intern., Inc.*, 683 A.2d 1049, 1052 (Del.Ch. 1996) ("[T]o allege that a corporation has suffered a loss as a result of a lawful transaction, within the corporation's powers, authorized by a corporate fiduciary acting in a good faith pursuit of corporate purposes, does not state a claim for relief against that fiduciary no matter how foolish the investment may appear in retrospect."). Therefore, Creditors have not demonstrated that defendants failed to exercise due care.

### d. Good Faith

 Delaware law does not recognize an independent duty of good faith. Under Delaware law,

[a]lthough corporate directors are unquestionably obligated to act in good faith, doctrinally that obligation does not exist separate and apart from the fiduciary duty of loyalty. Rather, it is a subset or 'subsidiary requirement' that is subsumed within the duty of loyalty, as distinguished from being a compartmentally distinct fiduciary duty of equal dignity with the two bedrock fiduciary duties of loyalty and due care.

*Orman v. Cullman*, 794 A.2d 5, 14 (Del.Ch. 2002) (quoting *Emerald Partners v. Berlin*, No. Civ.A. 9700, 2001 WL 115340, at *64 n. 63 (Del.Ch. Feb.7, 2001) (internal quotation marks omitted)). Good faith is also subsumed within the duty of due care. *Id.* at 19–20. Accordingly, summary judgment is granted for defendants dismissing Claim Three for breach of the duty of good faith.

 Creditors have failed to present any facts demonstrating that defendants acted in bad faith so as to establish a basis for their claims for breach of the fiduciary duties of due care and loyalty. The Delaware Supreme Court has defined "bad faith" as "not simply bad judgement or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." *Desert Equities, Inc. v. Morgan Stanley Leveraged Equity Fund, II, L.P.*, 624 A.2d 1199, 1208 n. 16 (Del. 1993). "[T]he absence of significant financial adverse interest creates a presumption of good faith, although the good faith requirement further demands an *ad hoc* determination of the board's motives in making the business decision." *See Estate of Detwiler v. Offenbecher*, 728 F.Supp. 103, 150 (S.D.N.Y.1989) (citing Delaware law). Bad faith may be found where a business

decision "is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *In re J.P. Stevens & Co., Inc. Shareholders Litigation*, 542 A.2d 770, 780–81 (Del.Ch.1988). As already discussed, Creditors have not established any significant financial adverse interest on the part of defendants, so the only question is whether the decision to make the Loan is so far beyond the bounds of reasonable judgment that it must have been motivated by bad faith.

According to Cumello, he "believed that if CB.com did not make the Loan, CB.com's assets would be consolidated into the assets of Crown Books, and the Unit Holders would lose their entire investment." (Cumello Dec. ¶ 42) Cumello further believed that structuring the transfer "as a loan, instead of a dividend, [would] balance the interests of CB.com and Crown Books [because] . . . the loan would entitle CB.com to repayments when it needed funds to pursue its development program further." (*Id.* at ¶ 43) Cumello also "believed CB.com would have recourse in bankruptcy" if Crown Books went bankrupt after the Loan. (*Id.*) Shenkman shared Cumello's beliefs, approving the Loan because he believed that "it was in the best interest of all the parties involved, including the Unit Holders, CB.com and Crown Books." (Shenkman Dec. ¶ 9) Defendants' expressed motivations for the Loan demonstrate that there was no bad faith towards Creditors or CB.com in favor of Crown Books, and that defendants had a good faith belief that the Loan would not harm Creditors or CB.com and could benefit them in the long run.

Further, it is undisputed that CB.com could not survive without Crown Books. According to Cumello,

> without Crown Books, CB.com would: 1) be unable to gain access to clients; 2) be unable to develop an effective product which displayed current and relevant books, periodicals and other products; and 3) not have the back office infrastructure to operate as an independent entity. As a result, CB.com had no hope for success without Crown Books.

(Cumello Dec. ¶ 13) Shenkman also believed that "[i]t was essential to CB.com's survival that Crown Books also continue in business." (Shenkman Dec. ¶ 9) Defendants' beliefs about the dependence of CB.com on Crown Books are bolstered by the Offering Memorandum governing Creditors' investment. The Offering Memorandum states that CB.com intended "to attract significant online traffic and business" through Crown Books' "established name, reputation and value proposition." (Def. Stmt., Ex. A at 4) The Offering Memorandum further states that the purpose of CB.com is to "permit *Crown Books customers* to shop online *at Crown Books* both from home and in the stores, and [ ] help to facilitate an online/offline community *for Crown Books.*" (*Id.*) (emphasis added) The Offering Memorandum informed Creditors when they purchased the Units that CB.com, as a wholly-owned subsidiary, existed for the benefit of Crown Books and would be entirely dependent on Crown Books for its customer base and its operations. In fact, the Offering Memorandum refers to the "Company" almost exclusively whenever discussing the new venture for which the Units were being offered, and the Offering Memorandum defines "Company" as *both* CB.com and Crown Books, leaving little doubt about the intimate, dependent relationship between these two entities. (*Id.* at Ex. A) Indeed, the Offering Memorandum effectively presents CB.com and Crown Books as one entity—namely, the "Company." (*Id.*) Therefore, defendants' business judgment that the Loan would help save Crown Books and that preserving Crown Books would help save CB.com

was not "so far beyond the bounds of reasonable judgment that it must have been motivated by bad faith." *See In re J.P. Stevens*, 542 A.2d at 780–81. Indeed, all evidence is to the contrary—namely, that defendants acted in good faith to preserve both Crown Books and CB.com.

Creditors argue also that defendants lacked discretion to use the proceeds from the Unit sales for the Loan, but this argument is belied by indisputable facts. The Offering Memorandum includes a provision entitled "Broad Discretion in Use of Proceeds," which reads:

> Although the Company has generally provided for the intended use of the net proceeds from the Offering as of the date of this Term Sheet, the Company cannot specify with certainty the amount of the net proceeds of the Offering that will be allocated for each purpose. In addition, the Company reserves the right to reallocate the use of net proceeds it receives from the Offering in *any manner it deems advisable*. Accordingly, the Company's management will have *broad discretion* in the application of the net proceeds. See 'Use of Proceeds.'

(Def.Stmt., Ex. A, ii) (emphasis added) This language leaves no doubt about the "broad discretion" of defendants in their use of the proceeds generated by Creditors' purchase of the Units. Moreover, defendants' broad discretion over the use of the proceeds was further articulated in the Supplement to the Offering Memorandum, which states: "The Company reserves the right to reallocate the use of the net proceeds received in the Offering in *any manner it deems advisable.*" (*Id.* at Ex. B, at 1) (emphasis added) Creditors argue that "broad discretion" is not the same as "unabridged, unbridled and unchecked discretion," and that defendants would need "sole" or "absolute" discretion to permit the Loan. (Pl.Mem.30) However, this is not a case where directors trans-

ferred company funds into their personal bank accounts; rather, defendants transferred funds to the parent corporation with the purpose of assisting the parent, which was entirely in keeping with their fiduciary duty to consider the best interests of Crown Books. *See Anadarko*, 545 A.2d at 1174. Defendants did not need absolute discretion to authorize the Loan, only broad discretion over the use of the proceeds, which they had under the express terms of the Offering Memorandum.

Further, the "Broad Discretion" provision of the Offering Memorandum refers to the "Use of Proceeds" provision, which states, in relevant part, for the third time: "The Company reserves the right to reallocate the use of the net proceeds it receives from the Offering in *any manner which it deems advisable.*" (Deft. Stmt., Ex. A at ii) (emphasis added) This provision also expressly informed Creditors that among the purposes for which the proceeds could be used was "for working capital and general corporate purposes of Crown Books." (*Id.*) Certainly, paying a debt owed by Crown Books in an attempt to avoid bankruptcy qualifies as "general corporate purposes." Therefore, defendants used the proceeds of the Unit sales for purposes expressly permitted under the terms of the Offering Memorandum. Indeed, it is entirely unclear for what purposes Creditors believe the proceeds could have been used. They challenge the purposes for which defendants used a portion of the proceeds—namely, the Loan—and yet offer no purpose for which they believe these proceeds should have been used. Creditors argue that at the time of the Loan CB.com "was already dead." (Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Summary Judgment ("Pl.Reply") 38) So Creditors' argument essentially boils down to the contention that defendants should have locked away CB.com's funds and thrown away the

key—funds for which CB.com had absolutely no use as a "dead" entity and which could be reallocated for any purposes under the express terms of the Offering Memorandum—and simply watched idly as Crown Books went under. However, this again ignores the fact that Crown Books was CB.com's parent company, and thus defendants owed Crown Books a fiduciary duty to manage CB.com in the best interests of Crown Books. *Anadarko*, 545 A.2d at 1174. In fact, doing as Creditors demand may have constituted a breach of the fiduciary duties defendants owed Crown Books. Of course, defendants also had a fiduciary duty to consider Creditors' interests as well, but defendants believed— rightly or wrongly—that Creditors would lose the funds in bankruptcy anyway, in which case the Loan put Creditors in no worse position while possibly preserving Crown Books, and CB.com with it. (Cumello Dec. ¶ 42) In sum, Creditors have not demonstrated that defendants acted in bad faith.

As already discussed, Creditors' claims are essentially an attack on the wisdom of defendants' decision. But the business judgment rule is intended to protect directors against just such attacks because their decisions are not to be second-guessed by courts with the benefit of hindsight. Creditors made high-risk loans for a high-risk venture by a high-risk company, and they lost the gamble. They were informed of all the risks associated with CB.com and Crown Books when they purchased the Units, and they were even afforded an opportunity to withdraw from their agreements with CB.com when CB.com failed to raise the desired funds in the time expected—yet Creditors chose not to walk away. (Def.Stmt., Ex. B) Defendants cannot be held liable for a business decision made in good faith with due care and without any controlling influences or personal interests, and such is the case here.

Creditors have failed "to make a showing sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." *See Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). They have failed to establish facts necessary to negate any element of the business judgment rule, and thus defendants are "entitled to judgment as a matter of law." *See* Fed.R.Civ.P. 56. Accordingly, summary judgment is granted for defendants dismissing Claim One for breach of fiduciary duty and Claim Two for breach of the duty of loyalty.

### B. Fraudulent Conveyance Claims

Creditors have brought claims against defendants for common law wrongful transfer and statutory fraudulent transfer. Creditors argue that defendants owed them "a duty not to wrongfully transfer or otherwise divert assets from Crown-books.com for other purposes." (Compl.¶ 59) Creditors further argue that defendants had a statutory duty "not to cause Crownbooks.com, in its capacity as a debtor, to make any transfer or incur any obligation without receiving a reasonably equivalent value in exchange therefore, at a time when Crownbooks.com was insolvent or became insolvent as a result of said transfer" or "under circumstances whereby the remaining assets of Crown-books.com would be unreasonably small in relation to the business or transaction." (*Id.* at ¶¶ 64, 68) According to Creditors, defendants breached their common law and statutory duties by causing Crown-books.com "to transfer $1.5 million to Crown Books Corp. by way of an unsecured loan." (*Id.* at ¶¶ 60, 65, 69)

#### 1. Choice of Law

█ Creditors argue that Delaware law should apply to these claims; defen-

dants argue that New York law should apply. "A federal court, sitting in diversity, must look to the choice-of-law rules of the state in which it sits—here New York—to resolve the conflict-of-law questions." *AroChem International, Inc. v. Buirkle*, 968 F.2d 266, 269–70 (2d Cir.1992) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). The parties not only dispute which state's substantive law should apply, but also which test under New York law should be applied to resolve the choice-of-law question. According to Creditors, the Loan involved the internal affairs of CB.com, and therefore the "internal affairs doctrine" should apply. According to defendants, however, Creditors' claims do not fall within the "internal affairs doctrine," and therefore an "interest analysis" should apply.

 "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.*, 457 U.S. 624, 645, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982). Under the internal affairs doctrine, "the law of the state of incorporation normally determines issues relating to the *internal* affairs of a corporation." *First National City Bank v. Banco para el Comercio Exterior de Cuba*, 462 U.S. 611, 621, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (emphasis in original). "Different conflicts principles apply, however, where the rights of third parties *external* to the corporation are at issue." *Id.* at 621, 103 S.Ct. 2591 (emphasis in original). Creditors' claims at issue here are tort claims regarding the rights of "third parties *external* to the corporation" as they are not brought by shareholders, officers or directors, nor are

they brought derivatively on behalf of the corporation. Therefore, the "internal affairs doctrine" is inapplicable here.

 New York law employs an "interest analysis" in tort actions that applies the law of the jurisdiction with the greatest interest in the litigation. *See Arochem*, 968 F.2d at 270. Under this analysis, the court should focus almost exclusively on the parties' domiciles and the locus of the tort. *Id.* "As part of the interest analysis, the New York Court of Appeals has distinguished between rules regulating conduct and rules governing loss allocation. Generally, when the laws in conflict are conduct regulating, the law of the locus jurisdiction applies." *Id.* "A fraudulent conveyance statute is conduct regulating rather than loss allocating." *See GFL Advantage Fund, Ltd. v. Colkitt*, No. 03 Civ. 1256, 2003 WL 21459716, at *3 (S.D.N.Y. June 24, 2003).

The only two states at issue here are New York and Delaware. None of the parties are domiciled in Delaware or New York, and the locus of the alleged tort is New York. In order to lay venue in the Southern District of New York, plaintiffs have alleged that "a substantial part of the events and actions of Defendants giving rise to the claims asserted [by plaintiffs] occurred within" New York. (Compl.¶ 3) Additionally, the private placement under which Creditors purchased the Units giving rise to this litigation was supervised by a law firm located in New York. (Def.Stmt., Ex. B) Creditors have not alleged any facts showing any actions related to this litigation that occurred in Delaware.

Further, New York recognizes the right of contracting parties to agree to the choice of law. *See Turtur v. Rothschild Registry International, Inc.*, 26 F.3d 304, 310 (2d Cir.1994). The Subordinated Note issued to Creditors here contains a provi-

sion entitled "Governing Law," which states: "This Note shall be governed by and construed in accordance with the laws of the State of New York." (Def.Stmt., Ex. D, ¶ 7(B)) Further, the Subscription Agreements entered into by the parties include a forum selection clause which states:

> Notwithstanding the place where this Subscription Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed in accordance with and governed by the laws of the State of New York. The parties hereby agree that any dispute which may arise between them *arising out of or in connection with this Subscription Agreement* shall be adjudicated before a court located in New York City and *they hereby submit to the exclusive jurisdiction of the courts of the State of New York* located in New York, New York and of the federal courts in the Southern District of New York with respect to any action or legal proceeding commenced by any party. . . .

(*Id.* at Ex. C, ¶ 4.4) (emphasis added) In *Turtur,* the Court of Appeals affirmed summary judgment against securities brokers who brought an action for common law fraud after purchasing units in a limited partnership. 26 F.3d at 305. The subscription note by which the plaintiffs purchased the units contained a forum selection clause nearly identical to the clause here. *Id.* at 309. The Court held that the plaintiffs' fraud claim clearly arose out of or was related to their investment, which was governed by the subscription note containing the forum selection clause, and thus the forum selection clause applied to their fraud claim. *Id.* at 310. The Court concluded that under the forum selection clause New York law applied. *Id.* Likewise, under the forum selection clause in Creditors' Subscription Agreements, New York law is the applicable law here. (Def.Stmt., Ex. C, ¶ 4.4)

 Creditors, in keeping with their argument that Delaware law applies, have brought their fraud claims under Delaware law. (Compl. ¶¶ 64, 68; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Pl.Mem.") 46–47) Defendants have moved for summary judgment on the ground, among others, that Creditors have invoked the wrong law, given that New York law actually applies. (Def.Mem.28) However, "the failure in a complaint to cite a statute, or to cite the correct one, in no way affects the merits of a claim. Factual allegations alone are what matters." *Northrop v. Hoffman of Simsbury, Inc.,* 134 F.3d 41, 45–46 (2d Cir.1997) (internal quotation marks omitted); *see also Brandon v. Holt,* 469 U.S. 464, 471, 105 S.Ct. 873, 83 L.Ed.2d 878 (1985) (holding that a court should decide the legal issues without requiring a formal amendment of the complaint where the allegations plainly identify a claim); Fed.R.Civ.P. 8 ("All pleadings shall be so construed as to do substantial justice."). Further, both parties have argued the merits of Creditors' fraud claims *arguendo* under New York law. Therefore, these claims will be considered under New York law.

### 2. Applying New York Law

 New York law does not recognize "a creditor's remedy for money damages against parties who, like defendants here, were neither transferees of the assets nor beneficiaries of the conveyance." *F.D.I.C. v. Porco,* 75 N.Y.2d 840, 842, 552 N.Y.S.2d 910, 910, 552 N.E.2d 158 (1990); *see also Gallant v. Kanterman,* 198 A.D.2d 76, 80, 603 N.Y.S.2d 315, 318 (1st Dep't 1993) (affirming dismissal of action for fraudulent conveyance where defendants were neither transferees or beneficiaries).

This is because "[t]he creditor's remedy in a fraudulent conveyance action is limited to reaching the property which would have been available to satisfy the judgment had there been no conveyance...." *Geren v. Quantum Chemical Corp.*, 832 F.Supp. 728, 736 (S.D.N.Y.1993), *aff'd.*, 99 F.3d 401 (2d Cir.1995). Therefore, there can be no action for damages against a party who did not receive any of the property sought by the creditors.

■ Creditors argue here that both Cumello and Shenkman benefited from the Loan, as already discussed, because "both Cumello and Shenkman had personal interests that were placed at grave risk by the prospect of a Crown Books' bankruptcy," and the Loan "enabled Crown Books to live for another day, and in turn, advanced their respective interests for their own personal benefit." (Pl.Mem.53) Creditors note that Shenkman held ownership interests in two companies that together owned 35% of the common stock of Crown Books, and that Cumello received a salary as President and Chief Executive Officer of Crown Books. (*Id.* at 53–54) However, receipt of a salary from the transferee corporation as an officer of the corporation is not sufficient to render the officer a transferee or beneficiary of the transfer. *See T.L.C. Merchant Bankers, Inc. v. Brauser*, No. 01 Civ. 3044, 2003 WL 1090280, at *7 (S.D.N.Y. March 11, 2003) (holding that payment of a salary to an officer of a corporation receiving a transfer of assets did not render the officer a transferee or beneficiary of the transfer). Crown Books was entitled to pay Cumello a salary, and there is no evidence that his salary was in any way derived from the transferred property. Indeed, the undisputed evidence is that the property transferred in the Loan, namely $1.5 million, was transferred to Paragon. Further, Shenkman's ownership in two companies holding stock in Crown Books is too attenuated a relationship to render Shenkman a

transferee or beneficiary of the Loan. In *Brenner v. Philips, Appel & Walden, Inc.*, No. 93 Civ. 7838, 1997 WL 33471053 (S.D.N.Y. July 22, 1997), the Court found no evidence that defendants benefited from a transfer of $500,000 to a company in which one of the defendants owned 35% of the shares. *Id.* at *1, *5. There, the defendant had direct ownership of more than one-third of the transferee corporation's stock, and the Court nevertheless found no benefit to the defendant from the transfer. *Id.* Here, Shenkman has some unspecified ownership interest in two companies that together own 35% of the Crown Books' common stock, leaving Shenkman with no direct ownership interest in Crown Books and even further removed from the transfer property than the defendant was in *Brenner*. Therefore, Creditors have failed to present any evidence demonstrating a benefit to defendants from the Loan, "an element essential to [their] case, and on which [they] will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Accordingly, summary judgment is granted for defendants dismissing Claim Four for common law wrongful transfer of funds, Claim Five for violation of § 1304(a)(2) of the Delaware Uniform Fraudulent Transfer Act, and Claim Six for violation of § 1305(a) of the Delaware Uniform Fraudulent Transfer Act.

## C. Tortious Interference Claim

Creditors allege that they and CB.com "were parties to Subordinated Notes, which were binding and enforceable contracts at law." (Compl.¶ 72) According to Creditors, defendants caused CB.com to breach these contracts by rendering CB.com insolvent after transferring "all or substantially all of its assets to another entity." (*Id.* at 74) Creditors have brought this claim mistakenly under Delaware law, just as they did their fraudulent convey-

ance claims. For the same reasons discussed above, New York law controls this claim.

■■■■■ "Under New York law, the elements of a tortious interference claim are: (a) that a valid contract exists; (b) that a 'third party' had knowledge of the contract; (c) that the third party intentionally and improperly procured the breach of the contract; and (d) that the breach resulted in damage to the plaintiff." *Albert v. Loksen*, 239 F.3d 256, 274 (2d Cir.2001). A "third party" for the purposes of a tortious interference claim is someone who is not a party to the contract at issue. *Finley v. Giacobbe*, 79 F.3d 1285, 1295 (2d Cir.1996). For an agent of a party to the contract to qualify as a "third party," the plaintiff must demonstrate that the agent acted outside the scope of his authority, *id.*, or "committed an independent tortious act against the plaintiff." *Albert*, 239 F.3d at 275. "A corporate officer or director generally cannot be liable for tortiously interfering with a contract between the corporation and a third party." *See Chardin v. Turkie*, No. 97 CIV 4643, 1998 WL 886986, at *1 (S.D.N.Y. Dec. 18, 1998) (citing *Murtha v. Yonkers Child Care Assn.*, 45 N.Y.2d 913, 915, 411 N.Y.S.2d 219, 220, 383 N.E.2d 865 (1978)). "Where the corporate officer/director is acting within the scope of his or her authority, the officer/director is not a third party vis-a-vis the corporation and as such cannot interfere with its own contract." *Id.*

■■■ The parties do not dispute that a valid contract exists between Creditors and CB.com. However, defendants do dispute the allegation that they are "third parties" given their positions as directors of CB.com and CB.com's status as a party to the contract with Creditors. Creditors argue, on the other hand, that defendants are "third parties" because they acted outside the scope of their authority when they made the Loan, "promoting their own self-interests adversely to the interests of Crownbooks.com." (Pl.Memo.58) Citing the same personal interests underlying their other claims—namely, Shenkman's attenuated ownership interest in Crown Books and Cumello's salaried position as an officer of Crown Books—Creditors once again argue that defendants sought "to keep Crown Books alive" for their own personal gain. (*Id.* at 59) But just as these interests were insufficient to support their other claims, so are they insufficient to support this claim. As already discussed, these interests were consistent with the best interests of Crown Books, which defendants had a fiduciary duty to consider as directors of CB.com, a subsidiary wholly owned by Crown Books. *See Anadarko*, 545 A.2d at 1174. Therefore, defendants acted well within the scope of their authority by trying "to keep Crown Books alive." Moreover, Creditors have not alleged any independent torts committed by defendants toward Creditors, and thus defendants cannot be deemed "third parties" for the purposes of Creditors' tortious interference claim.

Creditors have failed to present any evidence establishing "an element essential to [their] case, and on which [they] will bear the burden of proof at trial." *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Accordingly, summary judgment is granted for defendants on Claim Seven for tortious interference with contractual relations.

\* \* \*

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56. Therefore, for the reasons stated above, summary judgment is grant-

ed for defendants, and the complaint is dismissed.

SO ORDERED.